Young *v.* Young.

HULDAH B. YOUNG, individually and as administratrix of
Jacob Young, deceased, and DOROTHEA MCCORD,

*v.*

HENRY YOUNG, PETER YOUNG and SILAS W. DE WITT
administrator of Jacob Young.

1. The circumstances which will excuse delay in bringing suit for specific
performance of a contract to convey land, stated.

2. In order to make the enforcement of one demand, which is inconsistent
with another, a final and binding election to take that and not the other, the
party making it must either appear to have acted advisedly, with a knowledge
of all the circumstances and with a consciousness of the effect of the act relied
upon, or the party adversely interested must have so changed his position in
reliance upon such action that it would be inequitable to permit the party who
has the choice to recede from his former action.

3. The mere demand and receipt by a legatee of a legacy will not bar a
claim for land adverse to a devise by the will. In such case, in the absence
of any counter equity, the claimant would be permitted to have the land upon
condition of repayment of the legacy, with interest.

---

Final hearing on bill, answer and proofs.

*Mr. William H. Morrow* and *Mr. Louis H. Schenck,* for the
complainants.

*Mr. Gilbert Collins* and *Mr. George M. Shipman,* for the
defendants.

PITNEY, V. C.

This is a suit for specific performance. The allegations of the
bill as originally filed are set out fully in the previous report of
the case, found in *18 Stew. Eq. 27*. They are, in brief, that
Jacob Young, the husband of Mrs. Young and the father of
Mrs. McCord, was the son of one Henry Young, and that Henry
Young was the owner of a farm in Warren county, and that in
1849 he placed his son Jacob upon it and told him that he should

live upon it as long as he, the father, lived, and that he, Jacob, might make any improvements upon it that he chose, and that he, Henry, would either will or deed it to him, Jacob, at his, Henry's, death; that Jacob in his lifetime, relying on this promise, made extensive and permanent improvements upon the farm, at his own expense, with the knowledge and acquiescence of his father; that he died shortly before his father, and that his father failed to perform his promise, but, in his lifetime and after Jacob's death, made a voluntary conveyance of it to his two other sons, Peter and William, defendants herein, and also devised it to them by will.

The equity of the case is that Jacob, in good faith and reliance upon his father's promise to give him the farm, expended his moneys in permanent improvements on the farm, so that it would work a fraud on the complainants Dorothea McCord, the heir-at-law, and Huldah B. Young, the widow of Jacob, to permit the father and his two grantees and devisees, Peter and William Young, to refuse to perform the promise in question.

After the demurrer to the bill as originally filed had been sustained, as reported, the complainants amended their bill by adding the personal representatives of Jacob Young, viz., Huldah B. Young, administratrix, as complainant, and Silas W. De Witt, administrator with her, as defendant, he declining to join as complainant.

No answer was filed by De Witt.

Complainants further amended by adding allegations in excuse of their laches in filing their bill, and the chancellor, after hearing counsel, held these allegations sufficient, and ordered the defendants to answer, which Peter and William Young have done, and the cause has been brought to hearing on the pleadings and proofs.

The additional allegations found in the amendment are to the effect that, shortly after the judgment in ejectment, rendered in September, 1877, against the complainants in the Warren circuit, in favor of the defendants, referred to in the original bill, Mrs. Young consulted Mr. Sitgreaves, a solicitor of this court, practicing at Phillipsburg, as to what further proceedings should be

.taken in behalf of the complainants with regard to recovering this land, and that he suggested that the parties should secure the advice and services of the late Mr. Vanatta, then practicing at Morristown; that Mrs. Young saw Mr. Vanatta, stated her case to him, and that he suggested that the facts should be got together in a proper manner by Mr. Sitgreaves and submitted to him for further advice; that Sitgreaves undertook the work of collating the facts, but was taken sick and remained ill for some time, and died in March, 1878; that after his death Mrs. Young again consulted with Mr. Vanatta, and was by him advised to employ other local counsel, to wit, Mr. Dumont, of Phillipsburg, and that Mr. Dumont was retained and relied upon; and that Mr. Vanatta died in April, 1879, and Mr. Dumont became ill and incapacitated and did nothing. The bill further alleges that other suits and litigations arose between the parties, to wit, two suits were brought in the Warren circuit court against the defendants by Mrs. McCord, one for false imprisonment and the other for assault and battery, and that these causes were subsequently tried and verdicts rendered for the plaintiffs, and that further litigation ensued in the shape of rules to show cause and new trials, and the last of those causes was finally disposed of in April, 1884. Further, that in 1881 complainants consulted other counsel as to their rights in the premises, and were advised by him that they should bring a suit at law, in the name of the administrator of Jacob Young, against the executors of Henry Young, for the value of the improvements placed on the farm, and that such suit was brought in October, 1881; that a demurrer was filed to one of the pleadings, and that it was brought to hearing and decided in the year 1883 adversely to the plaintiffs, and the bill refers to the report of that case, viz., *Young* v. *Young, 16 Vr. 197.* The bill further alleges that the complainants were advised by counsel that, pending the progress of these various suits in the supreme court and in the Warren circuit court, they should not press their suit for specific performance.

The bill further alleges that in the year 1883 the complainants retained a certain counsel to do whatever was necessary to compel specific performance of the promise of Henry Young, and paid

him for his services, and that that counsel frequently promised to commence the suit, but that in 1884 they discovered that he had neglected to do anything in the matter, and thereupon they sought the advice of other counsel, to wit, the one at present engaged for them, and finally succeeded in inducing him to proceed with the cause.

Most of the allegations of the bill as amended are denied by the answer, and it sets up in addition that Jacob Young died insolvent, and that Henry Young was his security on a note for about $1,300, held by one Shoemaker, which Henry Young was obliged to pay; that by his will, dated April 12th, 1876, made eight days after the death of Jacob, he left a legacy of $3,000 to the complainant Dorothea McCord, and that she had claimed and received payment of that legacy. The answer also sets up as a bar the sworn claim against the estate of Henry Young by Mrs. Young, as administratrix, for $3,276, being the cost of the various improvements put upon the farm by her husband in his lifetime, and which was the foundation of the suit in the supreme court before referred to. And it also sets up the insolvency proceedings in the settlement of the estate of Jacob Young in the Warren orphans court, including an application to sell the lands of Jacob Young to pay his debts, with a schedule of those lands, which does not include the farm in question.

I. The first question is whether or not the excuse set up for the laches in bringing this suit was substantially proven at the hearing, and I come to the conclusion that it was so proven. It was shown that Mrs. Young and her daughter retained possession of the house in which the husband and father lived and was murdered, and that they attempted to get possession of the outbuildings. The result was that an action of trespass was commenced by Peter and William against them, or one of them, in the month of June, 1876, in the lifetime of Henry Young, the father. This suit was not pursued. Henry Young died in January, 1877, and shortly afterward another action of trespass was brought by Peter and William against the complainant, and also an action of ejectment. That suit they defended on the ground of adverse possession for more than twenty years by Jacob Young, whose estate

at his death descended to the daughter, Dorothea, subject to the dower of the wife, Huldah. They failed in their defence by reason of proof, offered at the trial, that Jacob Young paid full rent annually to his father up to the day of his death; shortly after that verdict was rendered they were turned out of possession. But they did not give up their claim to the farm, but looked for a new remedy. About that time they casually met Attorney-General Stockton, who was attending the Warren circuit in the prosecution of the famous *Freeholders' Conspiracy Cases*, and he advised them that their remedy was by a bill in chancery; they then called upon Mr. Sitgreaves, as alleged in the bill, and he advised them to secure the advice and services of Mr. Vanatta, and then they came to Morristown and saw him there, and also called upon him in New York. He advised them to continue the employment of Mr. Sitgreaves as local attorney to see the witnesses, get a statement of what they knew, and generally to get such a statement as counsel could give his opinion upon and advise about. They relied upon Mr. Sitgreaves, but his illness and death, and the death of Mr. Vanatta, drove them to seek other counsel. In October, 1878, they also retained and paid Mr. Dumont, of Phillipsburg, to bring a chancery suit, but he fell ill and did nothing. They then employed Mr. Lott, a young member of the Belvidere bar, to bring the actions in tort, which were brought. They also called upon the elder Mr. Gummere, at Trenton, laid their case before him, and he advised them to go to his son, who was then practicing in Newark. They went to him, and he advised an action at law, such as was brought and carried through successfully in *Smith* v. *Smith, 4 Dutch. 208.* Acting under his advice the sworn claim was put in against the executors of Henry Young, and the action brought, with the result as reported in *Young* v. *Young, 16 Vr. 197.* In the meantime, it also appears that there was considerable litigation in the orphans court of Warren county over a large claim presented against the estate of Jacob Young, which went to the prerogative court and is reported in *Young* v. *Young, 5 Stew. Eq. 275.* The action at law brought by the younger Mr. Gummere, which was decided at June Term, 1883, was finally disposed of by a

non-suit at the circuit, at the fall term of that year.   In the
meantime, and prior to January, 1883, probably on the intima-
tion by their counsel that the result in that case was doubtful,
they had consulted Mr. Voorhees, of the Flemington bar, with
regard to some remedy.    Mr. Voorhees was their counsel in the
trial of the actions of tort above referred to, and he, on the 23d
of January, 1883, wrote them that he had consulted with the
elder Mr. Gummere, and that he advised a bill in chancery.
This, be it observed, was before the decision of the suit at law.
Mrs. McCord swears, that, on the 30th of January, 1883, she
had an interview with Mr. Voorhees, in which she retained him
to bring that suit in chancery, and paid or secured to him on
that account $250, included in a note for $400, which it is ad-
mitted she gave him on that day.   She says that $150 of that
was for services already rendered by Mr. Voorhees in the actions
of tort before referred to, and that $250 was for the retainer in
the proposed chancery suit.    That note was subsequently paid
by Mrs. McCord.   Mr. Voorhees was called as a witness, and,
by the aid of his docket and other memoranda, declared that
nothing was included in that $400 note by way of retainer in
the chancery suit.    Considerable evidence was given on one side
and the other on that issue.    I am satisfied, not only from my
impressions at the time the evidence was given, but by a careful
re-examination of it and scrutiny of all the documentary evi-
dence on the subject, that Mrs. McCord is right, and that Mr.
Voorhees was mistaken simply.    Either that, or there was a mis-
understanding between them.    I am satisfied that Mrs. McCord
thought and believed that she had retained and paid Mr. Voor-
hees to bring the suit in chancery for her about this land.   Mr.
Voorhees may not have so understood it, or he may have for-
gotten it.    It is a matter of no consequence in this connection
how the misunderstanding or mistake arose.    The only question
here is whether or not Mrs. McCord was justified in relying on
Mr. Voorhees bringing a chancery suit.   I shall not give in de-
tail here my reasons for coming to this conclusion, but will give
them in writing separately if counsel desire.   Mr. Voorhees did
not bring the suit, and after a delay of a year or more Mrs.

McCord abandoned all hope of his doing so, and took further advice of Mr. Gummere, and looked about for somebody else to do it, and finally employed Mr. Schenck, who filed a bill as soon as he reasonably could, under the circumstances, after his retainer.

I conclude, therefore, that the facts as alleged in the amendment are substantially proven, and that the laches of the complainants has been sufficiently excused; provided, of course, that the defendants have not in the meantime altered their position irretrievably and have lost no serious advantage by the death of witnesses.

Now, notwithstanding this proof and what I must accept as the decision of the chancellor, that the allegations of the amendment were sufficient to excuse the laches, a spirited and forcible argument was addressed to me, which, in effect, attacked the decision of the chancellor and denied the sufficiency of the facts to excuse the laches. This argument, however, has not created a doubt in my mind as to the correctness of the chancellor's decision.

The complainants never abandoned the idea of recovering the farm, and they never rested in their efforts in that direction. The sickness and death of Messrs. Sitgreaves, Vanatta and Dumont caused a delay for which they were not responsible. After their death they went to Mr. Gummere, and under his advice the abortive action at law was brought, which occupied about three years; and then, again, came his advice as to a suit in chancery, and they at once acted upon it by employing counsel to bring it. They seem to have been prompt to seek counsel, and equally prompt to act upon counsel's advice. The case was a difficult one, the facts not easily collated and presented to counsel; the advice they received was not always the same, but whatever it was they acted promptly upon it; they visited their counsel frequently and furnished them with written statements of the evidence, and seem to have been urging on the suits as fast as they could. I omitted in the proper place to say that at one time they placed their case in the hands of Mr. Buchanan, of Trenton, who held it for some time and then declined to prosecute it. They

are quite free of the charge of waiting to see whether the enforcement of the contract would or would not be profitable to them before bringing their suit, and it is against that sort of delay that the wholesome rule of promptness is principally directed, as was shown by Chancellor Zabriskie in *Merritt* v. *Brown, 4 C. E. Gr. 286, 293*. They were advised by Mr. Voorhees, while he had the matter in charge, that they had twenty years in which to bring their suit, and need not hurry. That advice, though probably erroneous as applied to the particular facts of this case, was, as I suppose, founded on the notion that Mrs. McCord's position was that of a person who had paid full consideration for her purchase, so that the title was vested in equity, and had made valuable improvements upon the strength of it, and that the person in possession under the legal title was, in equity, a mere trespasser and without merit, and not entitled to invoke the rule of promptness in coming to the court which prevails in the ordinary suit for specific performance. However, the complainants did not act upon that advice, but urged their suit to be brought without delay.

There was no allegation or proof that any considerable improvements had been put upon the farm by the defendants since the death of Henry Young, and no counter equity arises in favor of the defendants on that score. The matter of the death of witnesses I will refer to further on.

My conclusion upon the question of laches is that, if it be established by the proofs that Henry Young did encourage his son Jacob to make improvements upon this farm by a promise to him that he would give it to him at his death, as a proper share of his estate, and Jacob did make substantial and considerable improvements on the strength of it, then the equity of his heir-at-law to have the benefit of that promise has not been lost by the lapse of time, and that the delay in bringing the suit is accounted for by the circumstances before mentioned.

II. The next question is whether the promise was made, in effect, as alleged by the bill.

[Here follows a review of the evidence.]

I arrive at the conclusion that the promise was made substantially as alleged.

The consideration required by the law is found in the actual expenditure by the son of moneys on the strength of the father's promise, and the detriment which the son will suffer if the promise is not performed.

III. The next question is whether the improvements were made, and to such an extent and of such a character as would render it inequitable for the promisor to recede from his promise.

[Here follows a statement of the evidence.]

I conclude, then, that Jacob did make additions and improvements on this property, under the promise of his father, to a considerable extent—probably not less than $1,500—without including either the vertical addition to the house or the new barn.

IV. The next question is whether any conduct on the part of the complainants, or either of them, in respect to any of the matters set up in defence, has the effect to bar the complainants' rights.

The action of Mrs. Huldah B. Young in putting in the sworn claim, as administratrix, for all these improvements, against the estate of Henry; the bringing suit thereon; the omission of this farm from the list of the lands of which Jacob died seized, on the application to the orphans court for leave to sell lands to pay debts, relied upon by the defendants—cannot operate as a bar to the equity of Mrs. McCord, who is the heir-at-law, and I doubt if they can at all affect Mrs. Young's right. It seems to me that the fact that they were defeated in their attempt to recover compensation for the improvements put upon this farm, not on the merits, but by the interposition of the statute of limitations, strengthens rather than weakens their equitable standing in their present attempt. It shows that they have no remedy at law and that the expense of the improvements put upon the farm by Jacob Young must be forever lost to his heir-at-law, unless a remedy in this court is found for her; and the fact that they were so defeated is due entirely to the plea interposed by the defendants therein, as executors of their father's estate. It

was in their power to permit the question of the amount of the value of these improvements to be ascertained by judicial proceeding and then to pay it. Instead of that, they set up the technical defence of the statute of limitations, which enabled them, at law, to retain the premises without paying for the improvements.

With regard to the rights of the creditors of Jacob Young, it is certain that the complainants sought, by defending the title in the action of ejectment, to have the property established as the property of Jacob Young, and if they had succeeded, of course his creditors would have taken it. The creditors had, presumably, notice of that suit, and were at liberty to watch it and to learn all the facts which were developed thereby, and they were at liberty themselves to institute proceedings, as they might be advised, to have that farm declared to be the property of Jacob Young. No act done or omitted on the part of Dorothea McCord has obstructed them in their rights in that behalf. Besides, it does not concern the defendants whether the creditors' rights have been ignored or not.

The demand and receipt by Dorothea of her legacy for $3,000 was, however, an explicit determination by her to take under the will of her grandfather, and, if she did that, she could not, at the same time, claim this farm, because thereby she disturbed the provisions of the will; and the serious question is whether that determination by her is to be treated as a final election by her between her claim to the farm, under her father's equitable title and her claim to the legacy under her grandfather's will, so that she shall not be permitted to retract it, return the money, with interest, and take the farm instead.

The authorities seem to concur in holding that, in order to make the enforcement of one demand, which is inconsistent with another, a final and binding election to take that and not the other, the party must either be shown to have acted advisedly, with a proper knowledge of all the circumstances, and with a consciousness of the effect of the act relied upon, or the party adversely interested must have so changed his position in reli-

.ance upon such action that it would be inequitable to permit the
party who has the choice to recede from his former action.

Chancellor Vroom, in *English* v. *English, 2 Gr. Ch. 509,*
uses this language: " What acts of acceptance or acquiescence
.are sufficient to constitute an election cannot be designated with
sufficient precision to justify a general rule. Each case, as it
.occurs, must be governed by its own peculiar circumstances.
The general questions are, whether the parties acting or acqui-
.escing were cognizant of their rights; *whether they intended to
make an election;* whether they can restore the individuals
.affected by their claim to the same situation as if the acts had
never been performed, or whether these inquiries are precluded
.by lapse of time."

In the same direction is what was said by Chancellor Runyon
in *Macknett* v. *Macknett, 2 Stew. Eq. 57, 58.* He there cites with
.approbation the case of *Wake* v. *Wake, 1 Ves., Jr., 335,* which
he states as follows : "A widow, after having received a legacy,
and for three years an annuity, between which legacy and
annuity and her dower she was bound to elect, filed her bill
.for her dower. It was held by Buller, J., sitting for the lord
.chancellor, that the receipt of the annuity for three years, and
the legacy, did not prevent her right of election, she being pre-
.sumed not to have acted with full knowledge, which would bind
her. ' The point is,' said he, ' whether she had full knowledge
of the circumstances of the testator and of her own rights. If
she had acted with full knowledge she should not afterwards
deny it, but after three years only. I cannot say she is not
entitled.' "

In *Anderson's Appeal, 36 Pa. St. 476,* a widow had accepted
several payments on account of interest on a fund left to her by
her husband's will, and was allowed, notwithstanding that, to
.recede and claim her dower upon a return of the money she had
received. Judge Reed says (at *p. 496*): "An election by matter
.in *pais* can only be determined by plain and unequivocal acts,
.under a full knowledge of all the circumstances and of the party's
rights."

And see *2 Jarm. Wills (R. & T. ed.) 40,* and note 19 of Mr.

Randolph. In looking at the cases it must be borne in mind that elections by widows between dower and benefits under a will are, in this and most other states, regulated by statutes.

Another consideration is that the doctrine of election is one resulting not in forfeiture, but compensation, so that a party claiming under a will shall not claim against that will except upon condition of compensation for whatever he may have claimed under the will. In other words, he is permitted, after having claimed under a will, to claim against the will, if, out of the claim against the will, he will make compensation for what he has claimed under the will. This seems now to be the established doctrine. *2 Jarm. Wills (R. & T. ed.) 1; 1 W. & T. Lead. Cas. Eq. (4th ed.) 543.* That principle, applied here, would permit Mrs. McCord to claim this land, notwithstanding having received the legacy, provided she will return the legacy, with interest.

The evidence shows that Mrs. McCord acted at all times under the advice of counsel; that she had a great many different counsel, and that they advised her diversely; and it does not appear that the question was ever presented to her mind that she was electing between the legacy and the demand for the farm. On the contrary, it appears that, before the last payment was made upon the legacy, she was advising with counsel from time to time about recovering the farm by filing a bill in equity; and it does not appear that any counsel called her attention to the effect of collecting the legacy or that she was aware of it.

As before remarked, it does not appear that the defendants have made any improvements on the farm or in any wise altered their position except in the payment of the legacy.

Upon the whole, I am satisfied the complainant Mrs. McCord never did elect to take the legacy instead of the farm, and therefore I hold the receipt of the legacy not a bar. But of course Mrs. McCord cannot have the farm without repaying the legacy, with interest. So with regard to the surety money of about $1,300, paid by Henry Young, for his son Jacob, to Mrs. Shoemaker. That was not set up as a bar in the answer, and, in fact, was added by way of amendment, and cannot affect the

complainant's right to recover, but only the terms upon which she shall be permitted to recover.

I conclude, then, that the complainants are not barred.

V. The next question relates to the terms upon which the complainants are entitled to relief, and here we come to the difficult part of the case. A part of it, however, as before remarked, is very clear. Complainants can only have the farm upon the terms of repaying to the personal representatives of Henry Young, who are the defendants herein, the amount he paid to Mrs. Shoemaker as surety for Jacob Young, with interest from the time of payment, less the dividends received from the estate of Jacob. Next, they must repay to the defendants the amount of the legacy of $3,000, with interest upon the several payments from the time they were made.

This brings me to the question of rents and profits. The complainants demand rents and profits substantially from the time of the death of Henry, because, although they had possession of the house for eighteen months afterwards, Henry Young had possession of the farm from the time of the death of Jacob, which was April, 1876, and Henry died January, 1877, and the defendants had possession from that time on.

I think that the complainants, by their conduct, have barred themselves from any demand for rents and profits up to the time of the filing of this bill. Up to that time their attitude was that of demanding the legacy, for it was inconsistent with the possession of the farm, and part of the time Mrs. Young was suing for the value of these improvements in a court of law. It was suggested by complainants' counsel that the difficulty in taking an account at this late day of the rents and profits during that period could be got over by fixing a rental value. But that might do injustice to the defendants. Believing, and having every reason to believe, that the farm was theirs absolutely, they may not have used it in the same way they would have done under other circumstances; they may not have derived any pecuniary profit from it whatever, and to fix a rental value and charge them with that might do them great injustice. Since the filing of the bill, however, I think there should be an account of

the rents and profits. The delay that has occurred in the progress of this suit has been mainly due to the demurrer filed by the defendants, which was without any intrinsic merit. The benefit of the laches could have been set up by the answer—the case might have been tried long ago and decision had; and, further, they had notice by the bill that they were liable to be called upon for rents and profits.

There is an item of the value of certain wood and timber cut and sold from the premises by the defendants, and also an item of money received by them for a right of way across the land. The complainants are entitled to an account of those.

In coming to this conclusion, I am aware that the result may be a substantial defeat for the complainants, for the reason that it is not probable the farm is worth taking upon these terms; but I cannot allow that circumstance to influence me.

If the complainants shall elect to redeem upon the terms above stated, and shall finally do so, they will be entitled to costs. If, however, they shall elect not to redeem, or shall not finally redeem, the bill shall be dismissed, with costs.

I cannot dismiss this case without an expression of regret at the long and varied litigation which has arisen between the parties. The complainant Mrs. Young, after having lived for twenty-seven years on the premises, and treated them as her home and as her husband's property, and the daughter, Mrs. McCord, after having been born and bred there, naturally felt chagrined at being ejected from it, and clung with unfailing tenacity to the idea of recovering it, and the granddaughter was treated with great harshness, apparently, by her uncles, so much so that two juries of the county gave large damages in her favor against them. This treatment engendered not only bitter feelings, but a desire for litigation, which has resulted in great pecuniary loss to both parties.