Jewett v. Bowman and Dringer.

---

HUGH J. JEWETT, receiver of the Erie Railway Company,

*v.*

HENRY BOWMAN and SIGMUND DRINGER.

1. A bill alleging fraud cannot, upon failure to prove fraud, be turned into an action of account.

2. Jurisdiction is exercised in matters of account only where some special cause is alleged, as where the accounts are intricate, or discovery is prayed, or some other ground peculiar to equity exists.

Jewett *v.* Bowman and Dringer.

3. Where an account or any other relief is incidentally asked, if relief on the main ground is denied, the bill should be dismissed.

4. An agent of a railroad superintendent who, after a public sale, revokes the sale by order of the superintendent, and then sells the same property at private sale for a less sum than was publicly bid, to the same person who bought it at public sale, with the approval of the superintendent both as to quantity and price, cannot be convicted of fraud in the transaction unless it is shown he fraudulently procured the superintendent's approval, or that he and the superintendent were both acting in fraud of their principal.

5. Irregularities and carelessness sufficient to arouse suspicion, do not supply the place of proof of fraud.

----

On bill, amended bill, answers, and proofs.

*Mr. R. Wayne Parker*, and *Mr. Cortlandt Parker*, for complainant.

*Mr. Thomas N. McCarter*, for Bowman.

*Mr. Socrates Tuttle*, for Dringer.

THE VICE-CHANCELLOR.

This action is brought by the receiver of the Erie Railway Company against a person who, until just before its commencement, was his purchasing agent, and, also, against Sigmund Dringer, a dealer in old metals, who, at its commencement, was engaged in business at Paterson. The bill presents a case of fraud. In my view, the only question necessary to be considered in deciding it is, has the complainant proved the frauds charged against the defendants or either of them. The question is one of fact exclusively. No legal rules are in dispute, and none need be considered except those which will aid in solving the disputed questions of fact.

On the argument it was insisted by complainant's counsel, even if it was found there was a failure of proof of fraud, still it would be the duty of the court to retain the bill for

the purpose of compelling the defendant Dringer, who, it is admitted, is largely indebted to the complainant, to account and make payment. I cannot adopt this view. The bill sets up a case of fraud and nothing else. The complainant must prove it or fail. He cannot charge a case of fraud, and seek to have the defendant's title to a large amount of property declared void, and then, if he fails to prove fraud, turn his bill into a bill for an account, and succeed in the action as a collection suit. While it is, undoubtedly, true that this court has concurrent jurisdiction in matters of account with the common law courts, it is also true it will not exercise jurisdiction in every case. Whether it will take jurisdiction or not, is a question always addressed to its discretion (*Seymour* v. *Long Dock Co.*, 5 *C. E. Gr.* 396) and, as a general rule, unless it appears the accounts are intricate, or discovery is necessary, or some other sufficient reason is shown why it should assume cognizance, jurisdiction will be declined. *Nesbit* v. *St. Patrick's Church*, 1 *Stock.* 76.

The bill in this case does not aver that there are any accounts between the defendant Dringer and the complainant, growing out of honest and legitimate transactions, which are intricate or complicated, nor does it show any other reason of justice or convenience why this court should take jurisdiction of the case as a matter of account. Discovery and an account are both sought; not, however, as distinct matters of relief, but simply as a part of the means the complainant has a right to employ, according to the usual practice of the court, in attempting to establish the fundamental facts of his case. They are, at most, mere adjuncts or incidents to the main object of his bill. The gravamen of his action is, that the defendant Dringer, under the pretext of purchases, has fraudulently obtained a large amount of his property. He asks that the title thus acquired may be declared void, and the property restored to him by the decree of this court. As mere aids in proving the fraud and obtaining full redress, he asks for discovery and an

account. Under a case thus made, it is manifest, I think, if the complainant fails to prove fraud, his case fails, and he is entitled to no relief. It is an established rule, that where discovery is sought as a mere incident to some other main relief, if the principal relief is denied, the bill must be dismissed. *Penn. R. R. Co.* v. *Hoppock*, 1 *Stew.* 261.

It would seem, necessarily, to follow, as a matter of principle, that where an account, or any other relief, was asked as a mere incident, or in aid of the main purpose of the bill, if the relief on the main ground is denied, the complainant should be dismissed. I am not willing to sanction a rule of practice which will allow a suitor to come into court charging against his adversary a case of fraud, which, if proved, will blast his reputation, and, when he finds he cannot prove it, will give him the right to escape defeat by turning his case into a collection suit. In this case the complainant has put his right to relief upon certain frauds which he charges the defendants have committed; if he has proved them, he is unquestionably entitled to relief; and, in my judgment, it is equally certain, if he has failed, that he ought to be dismissed.

Though the bill, as originally framed, contains several sweeping charges of fraud, but one transaction was described with the requisite legal certainty and precision; the others were stated so generally and vaguely that the defendants were not afforded the opportunity the law gives them of being clearly and distinctly informed of what they are accused before they are obliged to answer. The bill described this transaction as follows: In May, 1875, Bowman, pursuant to the direction of the receiver's superintendent, advertised the sale of eighteen hundred tons of old car-wheels, by soliciting bids; the defendant Dringer bid $22 a ton for one thousand tons; his bid was accepted and delivery ordered; the next day Bowman revoked the order for delivery, without reporting the revocation, and shortly afterwards commenced delivering wheels to Dringer at $19 a ton, and continued to do so until seventeen hundred tons

12

were delivered. If this statement presents the whole trans-
action, it was palpably fraudulent. A sale at a price so far
below what the buyer had previously offered, made pri-
vately, when the buyer knew the vendor had instructed his
agent to invite competition, can scarcely be esteemed
honest. But every circumstance indicating fraud is flatly
denied. Bowman, by his answer, admits that Dringer bid
for one thousand tons, but at $21 a ton, and not at $22; that
delivery was ordered by him and afterwards recalled; that
the recall was made by direction of the superintendent, who
directed him not to deliver the wheels unless they were paid
for at or before delivery; that no report of the recall was
made to the superintendent, because the recall was by his
order, which he knew would be obeyed at once, and, there-
fore, no report was necessary, nor would it have been
according to the ordinary course of business to have made
a report. He further says, that shortly afterwards Dringer
made an offer of $19 a ton, in cash, for seventeen hundred
tons of wheels, which he duly reported to the superintend-
ent, who subsequently, and after consultation with him
about the price, authorized him to sell the wheels to Drin-
ger at that price, and that the wheels were afterwards deliv-
ered to Dringer, in conformity with the superintendent's
directions. By the published terms of sale under which
Dringer bid for one thousand tons, fifteen per cent. was to
be paid when the bid was accepted, and the balance at the
time of delivery. It is admitted that immediately after
Bowman accepted Dringer's bid and ordered the delivery
of the wheels, the superintendent directed him not to make
delivery unless payment in advance was made. Bowman
had a right to treat this direction as an express order to
revoke the order for delivery. It was the only thing he
could do to obey the direction of his superior. This direc-
tion was a rescission of the sale to Dringer, or, if the sale was
not complete, it was a rejection of his bid. It is conclu-
sively proved that Bowman revoked the order for delivery
by direction of his superior. He certainly ought not to be

Jewett *v.* Bowman and Dringer.

convicted of fraud for obeying an order he was bound to respect.   But the material inquiry on this branch of the case is, Was the sale at $19 a ton made by the direction or with the sanction of the superintendent ?   His conduct in the transaction is not impugned.   The sale is charged to have been collusive. · The pith of the wrong imputed to the defendants is that the one agreed to sell and the other to purchase goods of the complainant, at a price much below what they both well knew they could be sold for.   To prove this, something more must be shown against the agent than mere carelessness or error of judgment, and something more must be shown against the purchaser than that he has, without deceit or corruption, made a good bargain.   All successful trading rests upon the principle that he who buys to sell again must buy at a price which will enable him to sell at a profit.   It was the duty of the purchasing agent to sell the old and worn-out material, under the direction of the superintendent.   This is so alleged in the bill, and established by the proofs.   He had the right to appoint the mode of sale and fix the price, and even his power to revoke the acceptance of a bid seems to have been recognized without question.   If, therefore, the sale in controversy was made by his authority; if he fixed or assented to the price (and his conduct is not challenged) it is difficult to see how the purchaser can be deprived of the benefit of his purchase on the ground of fraud in the price.   Let it be conceded the price is not fully up to the standard which the market, at that time, would have fixed, still the sale could not be disturbed unless it is also shown there was collusion.   There can be no pretence of collusion between the superintendent and the purchaser.

Upon the question, whether this sale was made by the authority of the superintendent, there is scarcely the semblance of conflict in the evidence.   Bowman swears when Dringer made his offer he at once told him it could not be accepted without the approval of the superintendent; he further says, as soon as an opportunity occurred he laid the

offer before the superintendent, informing him, if it was accepted, the sale would take nearly all the wheels on hand, but it was fair to presume if they were retailed to different purchasers, in lots of fifty or one hundred tons, a larger price could be obtained ; that the superintendent made no order then upon the subject, but merely said he would take the matter into consideration. Another interview occurred the next day; the superintendent then inquired whether $19 a ton was the best that could be done with the wheels ; he says he replied, it was, in view of the fact that the quantity was so large and the money was to be paid before the wheels were removed, and that thereupon the superintendent directed him to deliver the wheels at $19 a ton. The truth of this statement, in all its essential particulars, is admitted by the superintendent. He swears that Bowman asked him if he should sell a lot of wheels at $19 a ton, and that, after asking some questions about the market and whether the price was sufficient, he told him to sell, being under the impression that it was simply a small matter, such as was the subject of daily inquiry.

On cross-examination, in reply to the distinct question whether Bowman did not tell him the offer was for seventeen hundred tons, and would take nearly all on hand, he says he cannot recall that part of it; that he then supposed a sale of seventeen or eighteen hundred tons had been made, and only a few remained on hand. It thus appears, by the evidence on both sides, that the superintendent ordered a sale at $19 a ton. Whether it was a small or large quantity, the price, in his judgment, was not so grossly inadequate as to render it judicious to hold the wheels. So far, the proof is in perfect harmony. But, it is said, this direction was given under a misapprehension. Misapprehension as to what ? The quantity ? I cannot understand why the superintendent should have approved a sale of ten or one hundred tons, at $19 a ton, and not a sale of seventeen hundred tons at the same price. If seventeen hundred tons were worth $21 or $22 a ton, a less number of tons would

Jewett *v.* Bowman and Dringer.

surely be worth the same sum a ton. If $19 a ton was so grossly inadequate as to indicate fraud, the price would be a badge of fraud, whether the sale embraced one hundred tons or seventeen hundred tons. But suppose the superintendent did order the sale under a misapprehension, still Bowman cannot be convicted of fraud because the superintendent acted carelessly or upon imperfect knowledge. If it had been shown that Bowman fraudulently induced the superintendent to direct a sale, either by intentional misrepresentation or giving expression to an opinion he did not entertain, it could be justly claimed there was evidence of fraud. But Bowman swears that he plainly and distinctly informed the superintendent the offer was for seventeen hundred tons, and, if it was accepted, it would take nearly all the wheels on hand. He is uncontradicted. The superintendent does not attempt to deny it ; he simply says he cannot recall that part of the conversation. There is, however, evidence in the case which relieves it from all doubt on this point. By the invariable course of business the price of all old material sold was collected on vouchers, approved by the superintendent. These vouchers were made out by the person whose duty it was to deliver the material, and, as all sales were made under the direction of the superintendent, they were sent to him for examination and approval, and, after being approved by him, were sent to the treasurer for collection. When approved, they became warrants on which payments were demanded and made. They were the authority on which the treasurer acted. Their form is important. The following is a copy of the first one approved after the sale of the wheels :

" Motive Power Department.                     Month of July, 1875.
    Collection.                              Erie Railway Company.
Sigmund Dringer,
        Post Office address, Paterson.
1875. |                         To Erie Railway Company, Dr.
July. |    For 501 $\frac{1200}{2240}$ tons of old wheels, at $19, gross, $9,529.94.
        From Eastern Car Shop.
                        Approved:
                                E. S. Bowen,
                                        Gen'l Sup't."

The written contract for the sale of the seventeen hundred tons, bears date July 9th, 1875; between that date and the 1st day of November following, five vouchers, neither containing any article but wheels, and each plainly and conspicuously stating the price at $19 a ton, in form exactly like the foregoing, were approved by the superintendent and transmitted by him, in the regular course of business, for collection. The first is already given; there are two in August, one for five hundred and six tons, and the other for ninety; one in September, for two hundred tons, and the other in October, for seventy-one tons. I believe it was impossible for any person to approve papers, made up in the form these were, without observing the material, specified on their face, and its price. Nothing short of sudden blindness could excuse a person in not seeing the material and price, whose duty it was to pass upon them and authenticate them by his signature. They were approved while the transaction was fresh in the mind of the person who authorized the sale, and when even a perfunctory performance of his duty would have resulted in the detection of an attempt to sell five hundred and one tons under the guise of a few tons. I think it is proved beyond dispute that the sale in question was made by the authority of the superintendent, and I think it is also clearly shown that there is not the slightest reason to suspect the rectitude and honesty of the purchasing agent in the transaction.

By permission of the court, the bill was amended just before the hearing so as to charge several additional frauds. They may be classified as follows: First, obtaining by false weighing, or not weighing at all, larger quantities than were purchased; second, obtaining new and useful material under the name of waste; and, third, obtaining waste material far below its value. By these frauds, the complainant alleges, nearly four million pounds of metal, representing a value of nearly $40,000, were abstracted. They were perpetrated, if at all, within less than eighteen months, and

Jewett *v.* Bowman and Dringer.

required the active participation of several other persons besides the defendants.

The burden is on the complainant. He charges fraud. No presumption, not supported by convincing evidence, can be made in favor of its truth. It must be proved so as to convince the judgment. Dringer may rest securely upon his contracts and the vouchers issued to him by the complainant, until it is proved they were procured by fraud.

After the most careful and deliberate consideration it is possible for me to give to the case, I am compelled to say, I am not satisfied the complainant is entitled to a decree. There is enough evidence to excite grave suspicions, and to raise painful doubts touching the entire innocence of the relations existing between Dringer and some of the complainant's subordinates, but it requires something more than doubts and suspicions, even if they are painfully harassing, to justify a court in nullifying contracts, and depriving one man of property, which he holds by a title apparently valid, and transferring it to another. Property acquired by fraud should be restored; but, before restoration can be regarded as an act of justice, the fraud must be so clearly proved as to render it certain that restoration is not spoliation. The court must go wherever the proof leads; to that point it may go fearlessly and with the utmost complacency, but not a hair-breadth beyond.

I shall not attempt to present a full and careful review of all the evidence and arguments designated to demonstrate fraud. A book, rather than an opinion, would be the result of such an effort, if the utmost conciseness was observed. The case is choked to obscurity with books of account and papers containing calculations, and these have been made the basis of ingenious and conflicting calculations and conjectures, thereby, if possible, increasing the density of the obscuration. Obviously, no useful purpose would be served by attempting to review them, nor is it necessary to examine the great body of the evidence intended to prove fraud. Much of it, in my opinion, is distant, shadowy, and

inconsequential. Some of it was admitted in consequence of the great difficulty of determining in advance what would tend to establish the fact in issue, and what would not. Where the effort is to prove fraud by circumstances, the door must be thrown open wide, or the necessary link to complete a perfect chain may be excluded. I shall content myself with a few observations upon those features of the case which are deemed the most important.

Direct proof of fraud has been given by two witnesses. One swears Dringer gave him $100, in June, 1873, to reduce the weight to be reported of seven or eight car loads of material, from one thousand to three thousand pounds each; that this reduction was made with the consent of the person under whose direction he was working, and who afterwards received $25 of the bribe. He further says, he confessed his treachery to the company, in the latter part of 1874, or the early part of 1875, and has ever since remained in their employ. Dringer denies this story in all its parts, and the person accused of consenting to the alleged fraud, and of accepting part of its price, declares, so far as he is concerned, it is false throughout. It is proper to add, this witness's character for veracity has been impugned. His manner and bearing as a witness did not inspire confidence. The other testified to confessions by Dringer of various acts of bribery and corruption. If the words he puts in Dringer's mouth are true, the complainant has been extremely unfortunate in selecting his subordinates, for it may well be doubted whether there is one among them who has virtue enough to resist the seduction of a bribe. He confesses to a strong hatred of Dringer. There was rancor even in the emphasis with which he confessed it. His character for truth has been thoroughly impeached. An attempt has been made to sustain it. I do not think it was successful. Indeed, a character so generally esteemed bad, as this man's seems to be by a large portion of those who know him, cannot be made good except by a reformation of the life. Dringer has put himself upon his character as a man of integrity. A large

Jewett *v.* Bowman and Dringer.

number of highly respectable and prominent business men of Paterson, who have been acquainted with him during the whole of his business career there, and who have had business intercourse with him, concur in saying, as witnesses, that prior to the institution of this suit, his reputation for integrity and upright dealing was without a stain.   While a good character is no protection against direct and clear proof of fraud, its possessor has a right to put it in the balance, when, on the other side, the court is required to weigh circumstances placed there by a heart filled with malice.

Conclusive evidence of fraud, it is claimed, is furnished by Dringer's record of his business.   It is said, if the quantity of material which he had on hand when this suit was brought is added to the amount of his sales as shown by his books, and from the total thus obtained the sum of his purchases appearing on his books is deducted, it will appear he has obtained, in some unknown way, over four million pounds more than his books show he has purchased.   That he has obtained a large amount of property of which his books contain no record, is admitted.   If his business had been conducted on business principles, and with a view of preserving an accurate record of all his transactions, this large discrepancy would tend strongly to show mistake or fraud. But it is clearly shown that his books were not kept to preserve a record of his purchases.   He commenced business at Paterson, in 1869; he made no purchases, however, of the Erie Railway Company, until 1873.   Up to that date nothing like a correct record was kept of any part of his business; it may truthfully be said, his business was conducted without accounts.   He can write nothing but his name, and the style in which he writes that renders it certain he is utterly incompetent, for want of education, to keep accounts, even in the crudest form.   He swears he cannot read writing.   There is nothing in the case to sustain the charge that his illiteracy is feigned.   A considerable portion of the time he has been in business he was without

a clerk, now and then having some one to do a little writing for him.   Purchases in bulk, and not by weight, were made frequently, and no record of any kind made, and, in many instances, when purchases were made by weight, no record was made of either quantity or price.   Until 1874, when he erected scales of his own, the material he purchased was weighed on four different scales, no record of any kind being kept at but one; and, even after he had put up scales for himself, it appears, many of his purchases were weighed on scales belonging to other persons, and no record made. It is perfectly manifest, then, that his books do not contain a record of his purchases; he never intended they should; they were not kept for that purpose; indeed, it is quite apparent he did not possess sufficient knowledge of accounts to be able to comprehend the value and importance of such a record.   This removes from the calculation an indispensable factor; without it this large discrepancy does not exist, even in a problem, and the calculation is utterly impotent as proof of fraud.   Another important factor in this calculation is the quantity of material on hand when this suit was commenced.   Two civil engineers have attempted to ascertain it by measuring part and estimating the residue.   They differ nearly two hundred tons, or four hundred thousand pounds.   Both results cannot be correct; probably both are wrong.   The error is large.   The method employed is manifestly too uncertain to be the means of judicial evidence, if more precise can be obtained.   The evidence is not sufficient, in my judgment, to prove that Dringer, at the commencement of this suit, had a large amount of property which he acquired of the complainant by fraudulent means.

The charge that new and useful material was sold as waste has been successfully refuted.   It is admitted that certain obsolete spring-steel was sold as scrap, but the circumstances attending the sale, as narrated by witnesses, who, at the time of the sale, held important positions under the complainant, and whose apparent intelligence and impartiality entitle them to the fullest confidence, leave no

Jewett *v.* Bowman and Dringer.

doubt that the sale was both honest and prudent. There is no evidence to warrant the charge that a fraud was committed in reporting a less quantity than was, in fact, delivered. When all the facts now in evidence are considered, it is clear there never was the slightest reason to suspect the integrity of the sale of belting. I cannot resist the belief that the evidence produced in support of this part of the complainant's case was the result of zeal and contrivance, or malice, rather than actual discoveries made in an honest attempt to get at the truth. Professional detectives have, to some extent, prepared the complainant's case; they do not always limit their labors to a mere discovery of the actual facts, but, not infrequently, attempt to make a case. This case is marked by such attempts, and, therefore, some of the evidence supporting it is unworthy of implicit confidence. A judge's eye should be quick to discover fraud where it exists, and, when discovered, he should be resolute in exerting all the powers of the law against it, but he should also be careful not to be misled by false appearances, created by a subtle craft or ingenious surmises. What has been said of the alleged fraud in the sale of belting may be likewise said of the fraud alleged in the sale of white or Babbitt metal. Indeed, I think it is quite clearly shown that the witnesses who swore that they saw Babbitt metal in Dringer's possession, committed, either carelessly or ignorantly, a most grievous mistake, the article they saw being an entirely different metal.

Fraud in price was mainly practiced, it is alleged, in purchasing a superior class of material under the name and for the price of a less valuable; for example, No. 1 scrap iron was purchased as No. 2 or No. 3. Such a classification was unknown to some of the complainant's employes, who, it would seem from their business, ought to have known all about it. The evidence in support of this charge is drawn almost entirely from Dringer's books. It is said his sales of No. 1 scrap iron run up to nearly five millions of pounds more than his books show to have been purchased, and

hence it is inferred the excess was obtained fraudulently of the complainant. But the books do not contain a record of his purchases; they were not kept for that purpose. The inference, therefore, on which the proof of fraud rests, cannot be drawn; indeed, it cannot, according to any known rules of logic, be made to exist. Fraud in the price of other articles is also charged, but I shall not attempt a further discussion of the case. It is sufficient to say, after the most thorough and patient consideration it is possible for me to give to any question of fact covered by such an immense volume of evidence as the question in this case is, I am unable to declare that any of the frauds charged are proved so as to give the complainant a clear right to the judgment of the court. Irregularities and carelessness have been shown, sufficient to awaken perplexing suspicions, and to make the mind hesitate and doubt, but these cannot supply the place of convincing proof. The judgment must be satisfied. Nothing short of that degree of proof will make a decree in favor of the complainant an act of justice.

On a careful retrospect of the whole case, it is impossible for me to say that I am convinced of the truth of any one of the actionable charges made by the complainant against either of the defendants. His bill must, therefore, be dismissed, with costs. I will so advise.