## MARY A. McTAGUE

*v.*

## AUSTIN FINNEGAN et al.

1. Where the object of a suit in equity is to secure the specific performance of an alleged parol contract to leave the estate of a foster-parent to the child, the rule is that the agreement must be clearly established by satisfactory proofs. Such proofs do not exist in uncertain and unnecessary inferences.

2. Where parties to a contract have put it in writing, and that writing, upon its face, purports to contain the whole agreement between them, it will be the only evidence of the contract as concluded, and no parol proof of what was said and done during the negotiations which led to it will be admitted to alter or contradict it or to supply additional terms.

3. In such case proof will not be received to show a collateral promise between the parties at the negotiations, unless that promise relates to a subject distinct from that to which the written contract applies.

On bill, answers, replications and proofs.

*Mr. John H. Fort,* for the complainant.

*Mr. Alfred Mills, Mr. James R. English* and *Mr. Thomas F. McCormick,* for the defendants.

THE CHANCELLOR.

The complainant's bill alleges the existence of two contracts whereby, at the death of Patrick Rehill and Elizabeth, his wife, the complainant was to have their respective estates, and its object is to secure the specific performance of those contracts so far as the estate of Patrick Rehill is concerned.

The allegations of the bill are, that soon after the complainant's birth, in December, 1839, her mother died and her father committed her to the care of his sister, Elizabeth Rehill, and Patrick Rehill, her husband, who were about to visit Ireland, to conduct her to the home of her grandparents in that land; that the Rehills, having no children, became attached to her and

instead of delivering her to her grandparents kept her and treated her as their own child, and, after six or seven years, returned with her to America; that upon their return to America her father sought her surrender to him, and then the Rehills bargained and agreed with him that if he would make complete surrender of her to them, they would adopt her as their child, and maintain and educate her and "make" her the "beneficiary" of their joint and separate estates at their demise; that the surrender thus stipulated for was duly made, and the complainant thereafter remained with the Rehills as their adopted daughter, known by their surname, and rendered them service and obedience as their daughter until November, 1861, when, with their consent, she married one Peter S. McTague; that McTague thereafter became the partner of Patrick Rehill, in business as general contractors in the construction of railroads and work of kindred character, and remained such partners for many years; that in process of time McTague sued Rehill to secure an accounting of the partnership dealings, which suit resulted in a judgment for $17,000 in McTague's favor; that thereupon Rehill conveyed his real estate to a nephew and converted a large portion of his personalty into cash and fled to Ireland to escape the payment of the judgment; that Elizabeth Rehill, suffering from a cancer, was unable to follow her husband and therefore sent for the complainant and induced her to influence McTague to compromise the judgment; that the judgment was compromised for $5,000 in cash (which was subsequently paid) and an agreement that the family affection, which had existed before the suit, should be restored and the complainant should be recognized as the adopted daughter of the Rehills, "with," using the language of the bill,

"all the rights and privileges of inheritance of a child, and with the understanding that your oratrix was to be the beneficiary to their estates at their demise as fully and freely as if no estrangement had ever taken place; * * * and upon this express understanding and agreement that the matter of inheritance should not be disputed and that your oratrix should in nowise be affected by any misunderstanding existing between said Peter S. McTague and Patrick and Elizabeth Rehill, but that every provision, condition and understanding that existed before the suit should, by the terms of the agreement,

and in consideration of a reduction of $12,000 on said judgment of $17,000, be removed and the rights and privileges of your oratrix remain unaffected and the question of her adoption and the question of her inheriting as the beneficiary of their estates should be undisputed;"

that after the compromise had been effected Mr. Rehill returned to the United States, presented his wife with $40,000 of his moneys, made a will by which he bequeathed and devised the remainder of his estate to others than the complainant, and, a few days thereafter, died; and that a few months later Mrs. Rehill made her will, by which she bequeathed all her estate, including therein the $40,000 received from her husband, except $1,000, to others than the complainant and, shortly thereafter, died; and that before the suit by McTague against Patrick Rehill was brought, and while the complainant continued to be recognized by the Rehills as their daughter, her own father, John Lee, died possessed and seized of a considerable estate, of which he bequeathed and devised to her a much smaller portion than he would have given her if he had not believed that she would take the estates of the Rehills.

The complainant's object in this suit is to recover the estate of Patrick Rehill, including as part thereof the $40,000 which was given to Mrs. Rehill upon the return of Patrick from Ireland, and which constituted practically the whole property disposed of by Mrs. Rehill's will. The defendants are the executors, devisees and legatees under the two wills. The decree sought by the complainant, if made, will require the surrender of both estates and defeat the provisions of both wills.

It thus appears that the complainant relies upon two agreements, the first made about the year 1845, when she insists her father surrendered her and she became the adopted child of the Rehills, and the second when, in 1886, the proofs show the $17,000 judgment was satisfied.

The facts alleged concerning the first agreement, it is insisted, bring it within the principles decided in *Van Dyne* v. *Vreeland, 3 Stock. 370; 1 Beas. 142.* It is urged that it was a parol contract made by a father for the benefit of his child, in good faith, fully performed upon her part by her surrender to the

McTague *v.* Finnegan.

Rehills and her dutiful obedience to and service of them as their child, until, with their consent, she married, and her irretrievable detriment in the loss of a portion of the bounty of her father, which, but for his reliance upon the agreement, she would have had, which contract will be enforced in equity upon the ground that the non-performance will operate as a fraud upon the complainant.

The first difficulty I have with this alleged agreement, and it is an insurmountable one, is, that it is not proved to have ever been entered into. There is no direct proof that it was made. The facts that the complainant's father suffered the Rehills to keep his daughter; that she was called by their name and known as their daughter; that they said she was their adopted daughter, and taught her and suffered her to call them respectively "father" and "mother," and that they frequently declared to her husband and strangers that she would have their properties when they should die, are clearly established, but I do not perceive how they warrant the inference contended for, that the Rehills had absolutely bound themselves to John Lee to give the complainant their estates at their death.

Lee had lost his wife. He desired to make some disposition of his infant daughter. Mrs. Rehill was his sister. She and her husband were about to go to Ireland, and, taking advantage of the opportunity their proposed visit offered, he besought them to take the child to its grandparents. Mrs. Rehill was childless, and upon the voyage she and her husband became attached to the child committed to their care and kept it. That the father afterwards demanded it, is not proved. That he acquiesced in their retention of it and treatment of it as their own child, is clear. He married again and had five children by his second wife, and, upon the death of his second wife, married a third time and had two more children. As his family increased he witnessed the affection that his sister and her husband lavished upon the daughter of his first wife and her return of it, and knew of the increasing wealth of Patrick Rehill and his declared purpose to leave that wealth to this child. If he should take the child, he must take it from this opportunity and a happy home, and to the care

of a stepmother who had children of her own. Under such circumstances his acquiescence is not necessarily attributable to a surrender of his child under contract. It may as well be attributed to his resolution that it was best for her interests, in view of the probability of her ultimately having the estates of the Rehills, that he should leave her with them. He witnessed her marry a man in good circumstances, who, before Mr. Lee's will was made, became probably as rich as Lee himself. In view of that circumstance and of his daughter's prospect of bounty from the Rehills, it does not appear to have been unreasonable for him, in the disposition of his estate in absence of any contract with the Rehills, to put her, as he did, on a par with her half brother, who was able to maintain himself. The disposition of Mr. Lee's will was this : He allowed a married daughter the use of a dwelling-house until the final distribution of his estate. He gave the income of the residue of his estate to his wife for her life, requiring her to pay therefrom three annuities during her life to three of his children, no one of which annuities exceeded $400, and also enough from that income to educate two other children, and he provided that, upon the death of his wife and the completion of the education of those two children, the whole of the principal of his estate should be distributed equally among his seven living children, among whom the complainant was included.

I am inclined to think that the more natural inference from this testamentary provision for the complainant is that Mr. Lee did not have an agreement with the Rehills that his daughter should have their estates, but considered her taking them as an uncertainty, for otherwise he would probably have thought that with Rehill's estate and her husband's wealth she would have enough without sharing his estate with the six other children. The first contract is not proven.

It is claimed that the second contract was made at the settlement of the judgment which McTague recovered against Rehill. The agreement for that settlement was effected on the 20th of October, 1886, between McTague and Mrs. Rehill. It was brought about in this way : Rehill sent for his wife to join him

McTague v. Finnegan.

in Ireland. She was then suffering with a cancer and feared she could not survive the ocean voyage. The only escape from that peril apparently possible to her, was to secure the satisfaction of the judgment, so that her husband might return to America. To this end she directed her attention to enlisting the services of friends to induce McTague to enter into a compromise. On the 19th of October the son of McTague, a young man some twenty-four years of age, at the instance of his mother, called upon her at her residence in Philadelphia. She told the young man of her condition and wishes, and sent him to bring his mother to her. Mrs. McTague came on the 20th of October, and, joining in the effort to settle the judgment, sought her husband, who, on the same day, had an interview with Mrs. Rehill, at which he says he said to her:

"There is only one way that matter can be settled without paying the full amount to the court, and that is that Mr. Rehill and you recognize Mrs. McTague as your adopted daughter, as she always was, and heir, and I will settle with you,"

and that thereupon she assented to the terms he thus proposed. On the same day, immediately after this conversation, it appears that McTague and Mrs. Rehill went to the office of a Mr. Boyer, who had been the counsel of Mr. Rehill in the suit in which the judgment was recovered, to have their agreement reduced to writing, and stated to him its terms. Mr. Boyer drew the agreement in the shape of an unilateral contract, signed and sealed by McTague alone, in which he agreed, in consideration of $1 to him paid by Mr. Boyer as the attorney of Mr. Rehill, "and for the further consideration," quoting the language of the instrument, "of the relation of myself and family to P. Rehill and Elizabeth Rehill, his wife," upon the payment to him of $5,000 within sixty days by Mr. Rehill or his representatives, he would satisfy the judgment. The $5,000 was paid to him nine days later, on the 29th of October, by a Mr. Bines, who had formerly been employed as a civil engineer by Mr. Rehill, and who interested himself in Mrs. Rehill's efforts to secure a settlement of the judgment, and thereupon, advised by his own

counsel, McTague duly satisfied the judgment of record. It was not stipulated in the writing that Mrs. McTague was to receive the estates of Mr. Rehill and his wife when they should die. Mr. Boyer is positive that he embodied in the agreement all the terms that were stated to him, and also that nothing was said to him about Mrs. McTague having Mr. Rehill's property at his death, and that before the agreement was signed he read it aloud to Mr. McTague and Mrs. Rehill. He is contradicted in these particulars by Mr. McTague, who insists that he instructed Mr. Boyer that his wife was to be recognized as the adopted daughter of the Rehills and have their estates at their demise, and that the paper signed was not read to him or in his presence. It further appears that, after the execution of the paper, Mr. McTague was advised by his counsel who called on Mr. Boyer and saw the agreement, and that, after he had been so advised, he executed the agreement as drawn by taking the $5,000 and actually satisfying the judgment of record.

It is an established rule of evidence that where parties have put their contract in writing, and that writing, upon its face, purports to contain the whole agreement between them, it shall be the only evidence of the contract as finally concluded, and no oral evidence of what was said and done during negotiations leading up to it will be admitted to alter or contradict it or to supply additional terms. Also, that no proof will be received to show a collateral promise between the parties at the negotiation, unless that promise relates to a subject distinct from that to which the written contract applies. *Naumberg* v. *Young, 15 Vr. 331.*

I think that the writing in this case, upon its face, purports to contain the whole agreement between Mr. McTague and Mrs. Rehill. It treats of the compromise and settlement of the judgment, and provides that Mr. McTague, for $1, and because of the relation of himself and family to the Rehills, agrees to take $5,000 in satisfaction of the judgment. To add to it, by parol evidence, the additional term that the Rehills were to leave their estates to Mrs. McTague, would violate the rule above stated. Such a term cannot be considered a collateral promise. It re-

McTague v. Finnegan.

lates to the subject of the written agreement—the satisfaction of the judgment. It is true the testimony of Mr. McTague, that the writing was not read and that he insisted upon the insertion of the alleged missing term in it, is evidence tending to show that the instrument is the product of a fraud practiced upon him, but that evidence is clearly not strong enough to defeat the instrument which is supported by Mr. Boyer's oath and is vouched as valid by Mr. McTague's signature, and was carried into execution by him under the advice of his counsel.

But it is also remembered that this suit is for the recovery of the estate of Patrick Rehill, not for the recovery of the estate of Elizabeth Rehill. How was Patrick bound by the parol promise of his wife if such promise was in fact made? There is no proof that either she or Mr. Boyer acted under his authority. It is true he paid the $5,000, which Mr. Bines advanced, when he returned to America. If his payment may be said to ratify anything, it was the written agreement which was carried into execution by Bines' payment of the $5,000. Beyond that the proofs do not show that he is bound by anything that Mrs. Rehill or Mr. Boyer did.

I do not find that either of the alleged contracts alleged in the bill has been established, and, upon consideration of the whole evidence, I do not believe that any such contracts were ever. made. It was the duty of the complainant to establish them by clear and convincing proofs, for parol agreements of the kind, because of the situation and relation of the parties to them and the consequent opportunity for misunderstanding and the perpetration of fraud, are naturally regarded with suspicion, and when their enforcement is sought are properly the subjects of close scrutiny. *Vreeland* v. *Vreeland, 8 Dick. Ch. Rep. 387.*

Having reached the conclusion stated, it is not necessary for me to consider whether the terms of the second contract, as asserted, are sufficiently definite and certain to be enforced, nor whether the consideration relied upon to support the first contract is sufficient.

I think that Mr. Rehill's frequent declaration of his intention to leave his estate to Mrs. McTague may, to some extent, have

influenced her conduct towards him and secured from her, through her desire to please and thus retain his intention in her behalf, possibly more assiduous devotion to her foster-parents and their interests than she would otherwise have accorded them. But those declarations do not appear to have been made for the purpose of inducing such devotion. They were rather the voluntary exhibition of his love and admiration for her, and though Mrs. McTague may have had faith in them, they did not bind him to any legal liability. *Drake* v. *Lanning, 4 Dick. Ch. Rep. 452.* There can be no doubt that when he made them it was his honest purpose to fulfill them, and there can be little doubt that he would have done so had it not been for Mr. McTague's unfortunate exaction of his legal rights by resort to a litigation which embittered Mr. Rehill against him and his wife who sympathized with him, and resulted in Rehill's becoming a fugitive from his home and country and in the wreck of his hopes and happiness and, probably, in the expedition of his death.

The bill will be dismissed, with costs.