In 1891, complainant's mother, the widow of Charles H. Burdick, his father, met and married Joseph Senger, who, on January 26th, 1930, died intestate, without issue and leaving him surviving, besides complainant, two nephews, both of whom are parties defendant herein; his wife having predeceased him in 1917.
The bill of complaint substantially alleges that Joseph Senger, by agreeing to adopt complainant, take him into his home and look after him as a father, induced complainant's mother to marry him and to provide the money necessary to furnish their home and stock their proposed grocery store, and that said agreement, in so far as same was possible of performance on complainant's part, was fully performed by him. Upon the strength of these allegations, complainant prays for a decree of specific performance of the alleged adoption agreement therein mentioned, to the end that he may be decreed to be entitled to the whole of his deceased stepfather's estate.
While he concedes that no formal legal adoption was ever effected, complainant, nevertheless, contends that his right to the relief sought is not precluded for want thereof. In support of his contention, he, in addition to the alleged oral adoption agreement, relies upon these facts: first, that, in order to make his home with his brother and stepfather, he, of necessity, had to leave his aunt, with whom he had been living at Syracuse ever since the death of his father; second, that he made this "sacrifice" and entered the household of his mother and stepfather shortly after their marriage, when he was but seven years of age; third, that he continued to live there with them until about 1913, when, at the age of twenty-nine, he married and established a home of his own; and lastly, that during all of this time his stepfather always treated him with all the regard and affection of a son, whom he, in turn, always treated and regarded as a father. *Page 593 
Defendants, however, say that, notwithstanding the foregoing, this court is without power to grant complainant the relief asked, asserting, as they do, that there can be no decree for the specific performance of an oral adoption agreement. An examination of the cases, however, establishes that the better reasoning and the substantially unanimous current of authority is quite to the contrary.
From a very early date the courts of our state have, where such are based upon a sufficient consideration, upheld the validity and enforceability of oral agreements to devise or bequeath property and, in proper cases, have decreed their specific performance. In so doing, they have consistently rejected and refused to recognize the oft-asserted objection that to do so would be tantamount to enabling one to make a disposition of his property, to take effect at or after his death, without regard to, and even in direct contravention of, the express inhibitions and requirements of both the Statute of Frauds and the Wills act.
The trend of our decisions establish, as was said in Johnson
v. Hubbell, 10 N.J. Eq. 332, "that there can be no doubt but that a person may make a valid agreement binding himself legally to make a particular disposition of his property by last will and testament." The principles there enunciated have been approved and followed with practical unanimity by all of the subsequent adjudications in point: Ackerman v. Ackerman's Executors,24 N.J. Eq. 315; affirmed, Ibid. 585; Young v. Young, 45 N.J. Eq. 27; Young v. Young, 51 N.J. Eq. 491; Vreeland v. Vreeland,53 N.J. Eq. 387; Riley v. Allen, 54 N.J. Eq. 495; Duvale v.Duvale, 54 N.J. Eq. 581; Winfield v. Bowers, 65 N.J. Eq. 636;Clawson v. Brewer, 67 N.J. Eq. 201; Lawrence v. Prosser,88 N.J. Eq. 43; Antonsanti v. Van Brunt, 6 N.J. Mis. R. 83;140 Atl. Rep. 276; Salomonsson v. Olofsson, 105 N.J. Eq. 87.
To escape the force and effect of those principles, defendants attempt to differentiate between those cases and the one at bar by alluding to the fact that the agreements there involved were associated with, while the one at bar is divorced from, a provision to adopt the recipient of the *Page 594 
bounty thereunder. They, however, utterly fail to indicate wherein there exists any legal or equitable line of demarcation, as respects the enforceability of the contractual property rights secured under either of these two types of agreements. A mere consideration of the attempted differentiation of itself refutes the possible existence of any real difference and leads to the inescapable conclusion that any such fanciful distinction is but artificial, unreal and without difference in fact. Facts rather than mere subtle, deceptive or illusory distinctions must govern and control the judgment.
Notwithstanding the recognition and reaffirmation in those cases of the court's power to decree specific performance of oral agreements of the character there involved, defendants contend that, inasmuch as the one here involved is associated with an adoption provision, this court is divested of or precluded from exercising its power to decree specific performance. No good reason, however, has been suggested, nor does any appear, why the possession and exercise of this ancient and inherent power of a court of equity should be made to depend upon so uncertain and unsatisfactory a test as, at best, may be afforded by the far-fetched, baseless and nonexistent distinction here attempted to be drawn.
The mere inclusion of a provision to adopt in an agreement to devise or bequeath property should not, and cannot, ipso facto, divest a court of equity of this inherent power, the very possession of which is of almost equal antiquity with that of the court itself. Van Dyne v. Vreeland, 11 N.J. Eq. 370; 12 N.J. Eq. 142; Van Tine v. Van Tine (N.J.), 15 Atl. Rep. 249;1 L.R.A. 155; McTague v. Finnegan, 54 N.J. Eq. 454; Salomonsson
v. Olofsson, supra; Di Girolamo v. DiMatteo, 108 N.J. Eq. 592;Ferrando v. Corella, 113 N.J. Eq. 119. In each of those cases the agreement for the disposition of the property was coupled with a provision to adopt the recipient, and in each of them the right of the adoptive child to specific performance was recognized and upheld.
The courts of our sister states present a myriad of cases holding to like effect: Snyder v. Shuttleworth, 25 Ohio Cir. *Page 595 R. (N.S.) 545; Wright v. Wright (Mich.),23 L.R.A. 196; Chehak v. Battles, 133 Iowa 107; 110 N.W. Rep. 330; 8L.R.A. (N.S.) 1130; Crawford v. Wilson, 139 Ga. 654;78 S.E. Rep. 30; 44 L.R.A. (N.S.) 773; Odenbreit v. Utheim,131 Minn. 56; 154 N.W. Rep. 741; L.R.A. 1916 D 421; Fisher v.Davidson, 271 Mo. 195; 195 S.W. Rep. 1024; L.R.A. 1917 F 692;Middleworth v. Ordway, 191 N.Y. 404; 84 N.E. Rep. 291;Anderson v. Anderson, 75 Kan. 117; 9 L.R.A. (N.S.) 229;Winne v. Winne, 166 N.Y. 263; 59 N.E. Rep. 832; Doppman v.Muller, 114 N.Y. Supp. 620; affirmed, 122 N.Y. Supp. 1126;affirmed, 208 N.Y. 599; 102 N.E. Rep. 1101; Tuttle v. Winchell,104 Neb. 750; 11 A.L.R. 814.
It is now firmly established that an oral agreement to adopt, where there has been a full and faithful performance on the part of the adoptive child but which was never consummated by formal adoption proceedings during the life of the adoptive parent, will, upon the death of the latter and when equity and justice so requires, be enforced to the extent of decreeing that such child occupies in equity the status of an adopted child, entitled to the same right of inheritance from so much of his foster-parent's estate that remains undisposed of by will or otherwise, as he would have been had he been a natural born child.
The rule above stated is applicable to and governs oral agreements to adopt, whether such be associated with, or divorced from, a provision to provide for the adoptive child by will or otherwise. When a foster-parent accepts the custody of an infant child, surrendered to him by its natural parent upon the former's promise to adopt that child as his own, it must be conceded that such child is entitled to something beyond the bare and literal terms of that promise. It cannot be reasonably doubted but that the parties to such an agreement contemplated and intended that the act of adoption, when formally and legally effectuated, would carry with it, and confer upon the adoptive child, such rights of inheritance as it would be vested with by the statutes appertaining to adoption, descent and distribution. *Page 596 
The implied agreement arising from an agreement to adopt, not legally consummated, when the child has fulfilled its part thereof, is that the child should receive a child's share of the estate of which his foster-parent dies possessed and undisposed of by will or otherwise. Based upon this construction, and in order to do equity and justice, a court of equity, considering as done that which ought to be done, will establish and decree the child's right of inheritance from such estate to the same extent, as if there had been a formal legal adoption.
This court, in Van Tine v. Van Tine, supra, dealt with an oral agreement to adopt, devoid of a promise by the adoptive parent to give, by will or otherwise, any part of his property or estate to the adoptive child. In answer to the contention that the agreement was not such as the court could specifically enforce, Vice-Chancellor Bird said (italics are mine): "When Mrs. Stryker, being childless, said to her brother Peter, the father of Jessie, that she would take Jessie and would treat her as her own child, she meant just what she said, both in law and in conscience; she meant that Jessie would have all the benefit ofthe relation of parent and child," and he then proceeded to advise a decree accordingly.
The Van Tine Case, supra, was cited with approval and followed in Crawford v. Wilson, supra, in which there was also involved an oral agreement to adopt, unassociated with any provisions for property settlement upon the adoptive child. In rejecting the objection that the agreement was too indefinite to decree such child the right of inheritance to property as an heir, the Georgia supreme court, after decreeing specific performance, said: "The contractual obligation was to adopt petitioner as a child. If formal adoption had been consummated, then the law would have vested her with a right of inheritance from Mrs. Puckett, and it is this right of inheritance which petitioner is seeking to enforce in this action."
The principles enunciated in both of the cases above referred to were approvingly recognized and followed by Wright v.Wright, supra, in which the Michigan supreme court, after *Page 597 
adversely disposing of the objection to specific performance being decreed because the agreement lacked any obligation on the part of the adoptive parent to give or will any property to the adoptive child, said: "We think that there may be said to be a contract, impliedly at least, that defendant (adoptive child) was to have the property."
Consistent with the views expressed in the foregoing cases was that pronounced by the Minnesota supreme court in Odenbreit v.Utheim, supra, that "if the contract provided merely that they should adopt her as their child, and did not contain any express provision that she should receive the property of the Uthums, or a specified portion thereof, she has no other or greater rights than would have been given her by the statute in case she had been legally adopted."
In Fisher v. Davidson, supra, the Missouri supreme court had under consideration an agreement by an adoptive parent to "take and raise the plaintiff as their own child." Upon the strength of this agreement, the court held and decided that "plaintiff was entitled to a decree * * * declaring that she is the adopted child of Thomas Davidson, deceased, and as such is the legal owner of the property in controversy, subject to the statutory interests therein of the defendant, Augusta Davidson, as the widow of the deceased."
The determinations made in the case of Tuttle v. Winchell,supra, and Pemberton v. Heirs of Pemberton, 76 Neb. 669;107 N.W. Rep. 996, are of similar import and to like effect.
While a court of equity — when to do otherwise would result in palpable injustice — should unhesitatingly decree an adoption and its incidental and resultant rights of inheritance, where there has been no formal statutory adoption effected, it should, however, always require that the adoption agreement be first established by proof of the type and character required in such cases, with respect to the production and sufficiency of which it should be rigid and exacting.
Sight, however, must not be lost of the fact that parol agreements of that character are not looked upon with favor by the courts. Vreeland v. Vreeland, supra; Burrell v.Middleton, 72 N.J. Eq. 774; affirmed, 73 N.J. Eq. 741. Such *Page 598 
is but the natural result of the fact that they are easily fabricated and most difficult to disprove, since they most usually are not brought into controversy until after the grim reaper has intervened and forever hushed the voice of the alleged promisor. Moreover, they afford unlimited opportunity, with but little danger of detection, to unscrupulous persons, intent upon the pillage and spoliation of decedent's estates, for the perpetration of fraud and the wrongful diversion of a decedent's property from those to whom it otherwise naturally would have passed. It is because of these facts that the courts have come to regard this class of oral agreements with grave suspicion, have subjected them to close scrutiny and have allowed them to stand only when established by evidence that is clear, cogent and convincing, leaving no doubt with respect to their actual making and existence. McTague v. Finnegan, supra; affirmed, 55 N.J. Eq. 588; McNamara v. Bohn, 108 Atl. Rep. 764; Johnson v.Wehrle, 9 N.J. Mis. R. 939; 156 Atl. Rep. 229; Hamlin v.Stevens, 177 N.Y. 39; 69 N.E. Rep. 118; Rosseau v. Rouss,180 N.Y. 116; 72 N.E. Rep. 916; Roberge v. Bonner, 185 N.Y. 265;77 N.E. Rep. 1023; Holt v. Tuite, 188 N.Y. 17; 80 N.E. Rep. 364;Ranson v. Ranson, 233 Ill. 369; 84 N.E. Rep. 210; Spencer v.Spencer, 26 R.I. 237; 58 Atl. Rep. 766.
The question now presents itself: Has the complainant here sustained the onus of proof which the law, in this case, has cast upon him?
The evidence discloses that complainant's mother, while working in a factory in Passaic where she resided, sorrowfully learned that complainant, her infant son, by reason of their enforced separation, was beginning to forget her. This thought kindled her desire to establish a home of her own where she could once more have him with her and thus regain and enjoy his love, comfort and society, all of which, since the death of his father, had been denied her. The fulfillment of these hopes and expectations were brought nearer to realization by her subsequent marriage. Immediately thereafter, as was but natural, she brought complainant from *Page 599 
his aunt's home into the one established and maintained by her and her newly acquired husband in Passaic, where he received that tender care and attention — so essential for the protection, welfare and best interests of one of his tender years — which only a mother can give to her offspring.
The benefits of a grammar and that of a partial high school education were not denied him. He attended high school until his sixteenth year, when he went to work, bringing his earnings home to his mother and stepfather until he became twenty-nine years of age, when he married and established his own home. The friendly and pleasant relations, engendered by the days of his infancy, youth and early manhood, extending over a period of twenty-two years, which he spent as a member of their family circle, did not terminate with, but continued after, his marriage.
But, passing beyond these general surroundings, there is here to be found no direct cogent evidence of the alleged agreement here sought to be enforced. Allusion is made to the testimony of Harry Smith, complainant's uncle, who testified that Joseph Senger expressed to him his desire of going into the grocery business in Passaic where he had a wide acquaintanceship; had told him that complainant's mother, who alone had money, had agreed to finance that enterprise, as well as to furnish their home; and that he, in turn, "had agreed to do his full part in justice to her and her son and would adopt him and be just like a father to him."
Reference is also made to the testimony of the complainant and especially that of his wife, who testified that on the night before her mother-in-law died, Joseph Senger "went over the whole story from the beginning and told me how he and mother had married, how they went into business together, how she purchased the furniture, and he said, `all I have I owe to mother.' He said, `she has been very good to me' and then he told me the story of how Clarence had gone to Syracuse to live and how Mrs. Senger's folks wrote to them saying Clarence was forgetting her, and suggested that she had better make a home for him and take him along, then how she met Mr. Senger, and he was to adopt Clarence *Page 600 
and she was to set up the home, and that store, and he was to give Clarence fatherly care, because he needed a father."
Complainant also adverts to the fact that his stepfather often sought his advice with respect to household matters, always wanted and permitted him to select his wearing apparel; addressed a letter to him as "Dear Clarence" on the occasion of his daughter's graduation, and signed it "Grandpa Jos. E. Senger"; interchanged visits and small gifts with him and his family; and always called him "my son" or "Clarence my boy," while he in turn always addressed his stepfather as "father," "pop" or "dad." This was the substance of the additional testimony adduced by complainant and his other witnesses.
Upon the strength of testimony of the type and character which I have indicated, this court is asked to deprive the defendants of their deceased uncle's estate, to the end that it may be awarded to complainant.
It must be borne in mind that no written paper or memorandum of even the most informal character evidences the existence or terms of the alleged agreement. Not a single person was produced who claimed to have been present at the making of the alleged agreement between complainant's mother and stepfather, both of whom have since passed away. Nor was there anyone who, except upon hearsay and alleged admissions, undertook to state in a definite and comprehensive way what the terms of this alleged agreement were.
Instead of such evidence, I am relegated to a mass and maze of statements and admissions claimed to have been made by the dead man; statements and admissions which he is alleged to have made at different times, ranging over a period of more than forty years before their having been testified to; and statements and admissions which do not appear to have been carefully and deliberately made, but rather without consideration and in the course of impromptu and informal talks with relatives, neighbors and acquaintances. At best, the testimony from which these are deducible, because of its vagueness, the circumstances under which it was given and the pronounced interest of the witnesses, is far from convincing and very unsatisfactory. *Page 601 
The testimony of the complainant and his uncle, both deeply interested, considering its nature and character and their conduct and demeanor upon the stand, I am constrained to say is far from being satisfactory or convincing. No reason has been shown nor suggested why complainant's adoption should have ever been discussed as was testified to by complainant's uncle, especially since it clearly appears from his own testimony that Joseph Senger was then practically destitute, even being financially unable to furnish a home for his own wife.
On the other hand, the testimony of complainant's wife was apparently designed and formulated to meet the standard of proof required in these cases. The certainty and the precision with which it — by the mere recitation of an all-embracing conversation alleged to have occurred between her and the decedent more than fifteen years before the production of her testimony — attempts to establish each of the terms of the alleged agreement, claimed to have then been admitted to her by the deceased, excites and arouses the suspicion, and leads to the conclusion that it is unworthy of belief.
The case is devoid of any evidence which demonstrates or from which it may be inferred that complainant's mother, as was the fact in those cases wherein specific performance of such agreements have been decreed, ever relinquished or surrendered his custody and control to his stepfather; or that he ever forsook or renounced his filial duties and devotion to his mother in favor of his stepfather. Neither he nor his mother is shown to have made any sacrifice incidental to or as a result of his having left his aunt's home to come to live with her and his stepfather.
Under the circumstances here existing, all of the incidents referred to, as well as the ordinary and usual manifestations of household affection, indicated by family photographs, letters, small gifts and interchange of visits, were entirely consistent with the normal relationship of mother, son and stepfather. There is nothing in his entire mode of living or treatment, while a member of that family circle, from *Page 602 
which an inference of adoption can possibly arise or be drawn.
Summarized, the evidence relied upon to establish the alleged agreement consists mainly of the testimony of complainant, his wife and uncle, with respect to alleged conversations with, and alleged admissions by, the decedent. That type of testimony, especially when proffered by persons so deeply interested as they are, is at best weak, unreliable and most dangerous to predicate a favorable finding upon which, of necessity, would be followed by so grave and portentous consequences as here.
As already indicated, oral agreements of the character here relied upon are by reason of their own peculiar nature dangerous and all too often made the instrumentalities for the perpetration of frauds. As such, they threaten the very stability and security of estates, and incidentally cast grave doubt upon the power of man to dispose, as he sees fit, of that which is his own. By means of them and the testimony of witnesses who speak under bias and great temptation, yet conscious of their practical immunity from detection, the savings of one's entire lifetime may be pilfered and even snatched away from his heirs and next of kin.
Tested by the standards so wisely prescribed by law with respect to the character of the proof required in such cases, all of the foregoing evidence is found to be manifestly deficient and as coming far short from establishing that complainant's stepfather at some time or other made a specific agreement for his adoption, which was the theory adopted and pursued by complainant as the basis of the right to the relief here sought by him.
There still remains for consideration complainants asserted right to an accounting for the moneys which he claims to have earned and turned over to his mother and stepfather while he lived with them. At the outset it is to be noted that an accounting in equity cannot be demanded as a matter of right or course. As was said by Vice-Chancellor Reed, in Bellingham v.Palmer, 54 N.J. Eq. 136: "The equitable *Page 603 
jurisdiction to compel an account, rests upon three grounds — first, the existence of a fiduciary or trust relation; second, the complicated character of the accounts; and third, the need of discovery."
The principles there laid down were followed and adopted by subsequent adjudications of this court, notably amongst which are: Inhabitants of Township of Crawford v. Watters, 61 N.J. Eq. 284; DeBevoise v. H. W. Co., 67 N.J. Eq. 472; Daab v.New York Central and Hudson River Railroad Co., 70 N.J. Eq. 489.
None of these cases, however, curtailed or attempted to limit that large discretion invested in this court, to assume or reject the cognizance of such cases, as the circumstances of the particular case may render expedient, a discretion which, as pointed out in Seymour v. Long Dock Co., 20 N.J. Eq. 396,
this court reserves to itself. Jewett v. Bowman, 29 N.J. Eq. 174; Ely v. Crane, 37 N.J. Eq. 157; Lehigh Zinc and Iron Co.
v. Trotter, 43 N.J. Eq. 185; Pine Building Co. v. Grossman,102 N.J. Eq. 189.
There is not an iota of satisfactory evidence with respect to the manner in or the circumstances under which complainant paid those earnings to his mother and stepfather or from which any fiduciary or trust relation is established, or may be inferred, between complainant and his departed stepfather. It has neither been testified to nor claimed that these earnings were paid over under or pursuant to any understanding, express or implied, between complainant and his stepfather that they turned over to or received by the latter in trust for the former.
Nor is the existence of any such arrangement or agreement established by nor inferable from the mere fact of their payment. Under the circumstances here existing, those alleged payments to complainant's mother and stepfather were entirely consistent with a recognition and satisfaction on complainant's part of their legal right to his earnings until emancipated. The law is now well settled that a parent or step-parent, standing in locoparentis to the stepchild, is entitled to his earnings, until his emancipation. Williams v. *Page 604 Hutchinson, 3 N.Y. 312; Magnuson v. O'Dea, 75 Wn. 574;135 Pac. Rep. 640; 48 L.R.A. (N.S.) 327; 46 Corp. Jur. 1340 §186.
This right of the parent or such step-parent, as the case may be, does not terminate upon the child attaining his or her majority. Where, as here, the child has elected to continue to stay with his mother and stepfather, who, in turn, have continued to provide him with his sustenance and support, the right to his earnings will not, ipso facto, cease and terminate upon his reaching his twenty-first year, but on the contrary will continue until he elects to emancipate himself. Overseers v. Overseers,16 N.J. Law 169; Ridgway v. Ex'rs of English, 22 N.J. Law 409;Brown v. Ramsay, 29 N.J. Law 117; Goldstein v. Goldstein,4 N.J. Mis. R. 711; 134 Atl. Rep. 184.
The need of a discovery here, even if any such exists or be claimed, is only incidental to the accounting here sought. Consequently, the present action cannot be supported as one for discovery, because, as was pointed out in Bellingham v.Palmer, supra, "the rule is entirely settled that where discovery is sought as a mere incident to some other main relief, if the principal relief is denied, the suit must be dismissed.Pennsylvania Railroad Co. v. Hoppoch, 1 Stew. Eq. 261; Jewett
v. Bowman et al., 2 Stew. Eq. 174; Foley v. Hill, 2 H.L. Cas.28, 37, 42."
The account, if any such exists, and none has been established, is not an intricate or "complicated" one, within the meaning and definition of such, which in Inhabitants of Township ofCrawford v. Watters, supra, was held to be those where "the issues necessary to be determined, in order to arrive at a just conclusion, are so numerous and dependent upon such a variety of evidence, or of evidence of such a technical character, as that it is substantially impossible for a jury, retiring in the ordinary way to a jury room and obliged to carry all the oral evidence in their memories, to come, at one session, to anything like a just and proper conclusion." American Central InsuranceCo. v. Landau, 62 *Page 605 N.J. Eq. 73. The evidence with respect to the account, if any such here exists, cannot possibly be of a technical, voluminous or tedious nature, nor such as to require the attention of a skilled expert.
The cases of McGee v. McGee, 78 N.J. Eq. 430, and Bacon
v. Devinney, 55 N.J. Eq. 449, relied upon by complainant, oppose, rather than support, his right to an accounting, since it nowheres appears here, as was the fact found in the McGee Case, that complainant placed any money in the hands of his stepfather as his "mere depository and solely as a matter of convenience, without any intention or purpose on his part to relinquish dominion or control over it," and that the latter "received the money with the same understanding and purpose."
Aside from the fact that complainant has failed to establish his right to an accounting in this court, I am fully satisfied that, under the facts and circumstances here shown, expediency and discretion require that he be left to his remedy at law with respect to his claim, if any, against the estate of his deceased stepfather by reason of earnings alleged to have been turned over by him to the latter.
A decree dismissing the bill will be advised.
 *Page 1