MINNIE WINFIELD

*v.*

BRIDGET M. BOWEN, individually and as administratrix of Simon Cosgrove, deceased, et al.

[Filed December 18th, 1903.]

1. A tugboat captain, who was a bachelor and an old friend of complainant's family, was in the habit, for about fourteen or fifteen years, of coming to her house about once a week, where a room was always kept for him. He generally came on Saturday night, and returned to his boat on Sunday night or Monday morning, and on these weekly visits complainant kept his books and wrote out reports which he was

Winfield *v.* Bowen.

obliged to hand in to the bookkeeper of his employer—work which he was incapable of doing in a satisfactory manner. After he gave up his employment he resided continuously in complainant's family for about five years, during which time he was supplied with board, lodging, washing and mending, and was nursed by complainant through several illnesses.—*Held*, that what he received from complainant was furnished under circumstances which gave her a legal right to compensation, and not under circumstances which merely left her to expect voluntary compensation by his will.

2. Evidence considered and *held* sufficient to show an agreement to devise a house and lot in payment for services rendered a decedent.

3. Where, in consideration of services rendered a tugboat captain, in assisting him with his books and reports as to his business, and in attending to his washing and mending, and supplying him with board and lodging at the house of complainant, where he was in the habit of spending much of his time for a long period of years, he orally agreed to will complainant a particular house and lot, of which complainant took possession, with her family, as a home, the specific performance of the agreement is the only adequate remedy which will compensate her for her services, whether or not she is able to maintain an action at law for compensation.

4. Complainant, in 1872 or 1873, began to render regular and valuable services to C. in consideration of his oral promise to compensate her at his death by a devise of a house suitable for a residence. In reliance upon this promise the services were continued for fourteen or fifteen years. After about eight years of continuous service, in 1881, complainant and C. selected a lot in the city of Newark, which C. thereupon purchased and had conveyed to himself, and upon which he erected a residence adapted to the complainant's requirements. The complainant at once took possession of the residence with her family and C. continued, as formerly, his practice of making the house his home a part of the time. After about twelve years of service on the part of complainant, some time in 1885, C. executed a valid will, devising the house and lot to complainant, and also giving her a legacy of $2,000. This will was, with C.'s knowledge and consent, delivered to complainant, who kept possession of the same for about eleven years. In 1887 C. gave up business and the complainant's services, for the most part, ceased. C., however, then established a permanent and continuous residence with complainant, where he was gratuitously supported for about five years. In 1887 C. proposed to the complainant that another residence be selected in the place of the one she occupied. Accordingly, with complainant's consent, the residence was sold and a new lot selected and a house was erected thereon by C., in accordance with complainant's wishes. C. most positively declared at the time to the complainant and others that the new house should take the place of the former one, and that it belonged to complainant, and that he was building the house for the complainant. C., in terms, promised the complainant that the new house should be substituted in the will for the former one. In reliance upon the promises and representations of C., the complainant allowed

Winfield *v.* Bowen.

her action at law on a *quantum meruit* to become subject to the defence of the statute of limitations while the will was in her possession. About 1896 C. obtained the will and presumably destroyed it. C. died intestate in 1899. In a suit against C.'s heirs and administrators—*Held,* that a promise to devise land is within the statute of frauds; that the circumstances of this case, including the continuous possession of the house and lot by the complainant, the possession of the will by the complainant and the subjection by the complainant of her claim at law to the defence of the statute of limitations, in reliance upon C.'s promises and representations, took the case out of the operation of the statute and entitled the complainant to the remedy of specific performance; that to deny the complainant the remedy of specific performance would lead to the accomplishment of a fraud—that fraud is not redressed, but prevented, by the equitable remedy of specific performance in cases of this kind.

*Mr. Chauncey G. Parker,* for the complainant.

*Mr. Adrian Riker* and *Mr. L. M. Southworth* (of the New York bar), for the defendants.

STEVENSON, V. C.

The complainant files her bill against the administratrix and heirs of Simon Cosgrove, deceased, to recover compensation for services rendered and board furnished to him during his lifetime by the specific performance of an agreement to devise a house and lot in Newark, or in case compensation cannot be so secured then by a decree for the value of the services and board in money. The defendants deny that deceased made any contract and deny that the complainant furnished anything of value to the deceased for which she is entitled to compensation.

Simon Cosgrove died in January, 1899. His exact age was not proved, but was stated to be about fifty-seven years, although there are indications that he was somewhat older. He was a friend and probably nearly a contemporary of the complainant's father, one Sofield, who was a pilot in New York harbor, living at Elizabethport, New Jersey. Cosgrove was the captain of a tugboat and appears to have been a frequent visitor in the Sofield family, at Elizabethport, which included the complainant. The complainant, then a young woman, was a school teacher. She is evidently a woman of intelligence and fair education.

Captain Cosgrove, although probably efficient as a tugboat captain, was an illiterate man, as is shown by the numerous specimens of his handwriting. He was manifestly incapable of keeping an even fairly legible and correct set of books. His business required that he should do this thing to a very considerable extent. During the whole period with which we have to deal he had no interest in the tugboat which he commanded, but was in the employ of the person or persons who owned the boat. During the greater part of the time he was in the employ of a contractor, the late E. G. Brown, of Elizabethport, who owned dredges and similar appliances for construction work in our harbors. It was a part of Cosgrove's duty as captain of the tugboat and manager of the more or less extensive business done therewith and necessarily for the most part done under his eye alone, to keep an account of all the work that his vessel did upon the various jobs in which from time to time it was employed, such as towing dredges, vessels, rafts, &c., and often also to fix the value of the different items of work accomplished by his boat.

Mr. Rogers, the clerk and bookkeeper for years of Mr. E. G. Brown, was produced as a witness for the defendants. Mr. Rogers described the work which Captain Cosgrove did and showed that "he could not get along without keeping some books;" that he was obliged, about once in two weeks, to submit a written statement to the bookkeepers of his employers, exhibiting and classifying the work which his tug had done. This witness also showed that there was considerable business connected with the tug which involved the keeping an account by Captain Cosgrove "of his labor items and board items, and coal and things of that kind."

It was natural that Captain Cosgrove should seek the aid of some competent person to keep his books and make his reports. It was natural that he should go to the complainant for this work, as she was the daughter of his old friend. He knew her intimately, always addressing her by her first name. She was sufficiently well educated to be a teacher, and she testifies that she had taught bookkeeping. The necessity for this assistance appears to have arisen in the early seventies, when Captain Cos-

grove assumed the charge of Mr. Brown's boat. At that time (1872) the complainant, who had been married the year before to her present husband, was residing in small but in apparently comfortable quarters in Jersey City. Her husband was a fruit broker in New York. They kept no servant. Captain Cosgrove adopted the practice of coming to the Winfield home in Jersey City about once a week. He generally came Saturday night and returned to his boat on Sunday night or Monday morning. According to the testimony of Mr. Winfield, he paid nothing for his board. There is no indication that, either then or at any time thereafter while the relations of these people to each other lasted, Captain Cosgrove ever paid anything directly or indirectly for his board and lodging. He maintained this habit of coming to the Winfield home about once a week, where a room was always kept for him, for fourteen or fifteen years—while the family lived part of the time in Jersey City and part of the time in Newark. In the year 1887 or 1888, when the Winfields were established in Newark and Captain Cosgrove was obliged, from physical incapacity, to give up his employment, he established himself permanently with the Winfields and resided with them continuously for about five years—until 1893. During this period he was supplied with board, lodging, washing and mending, and during several illnesses was nursed by Mrs. Winfield. Under the circumstances proved in this case it would be very surprising if Captain Cosgrove ever paid for these services and ministrations without leaving some evidence of the fact. There is no evidence of any such payment and Mr. Winfield, who was the man of the house and in the absence of a special arrangement would be entitled to receive the board-money if the same was paid, swears positively that Captain Cosgrove paid no board. Under the proofs in this case the finding is inevitable that Captain Cosgrove paid nothing for this large measure of support which he received from the Winfield family during a period of about twenty years. His position in the family, undoubtedly, was largely that of an intimate friend. He was a bachelor, having apparently no relatives residing near him. He was not only attached to Mrs. Winfield and her hus-

band, but bore a tender affection for their only child. This child, a boy, Francis S., was born in 1881 and received Captain Cosgrove's name Simon.

The evidence satisfies me that from 1872 until 1886 or 1887, when Captain Cosgrove quit his active employment, the complainant, Mrs. Winfield, attended to his bookkeeping. When Captain Cosgrove made his weekly visit to the Winfield home, he carried his illiterate scrawls in diaries and on slips of paper, some of which have been offered in evidence, and from these materials Mrs. Winfield made the proper entries in the necessary books. At regular intervals, also, Mrs. Winfield wrote out the reports which Captain Cosgrove was obliged to hand in to the bookkeeper of his employer. Mrs. Winfield testifies that she wrote these reports on foolscap paper. Mr. Rogers, the bookkeeper of Mr. E. G. Brown, testified that, during the whole period of about fifteen years, during which this course of business was continued, Captain Cosgrove handed in his reports on foolscap paper, written out not by his own hand but in handwriting which apparently was that of a woman and was uniformly the same handwriting.

The evidence in this case, to my mind, compels the conclusion that Captain Cosgrove not only received from this Winfield family, who were by no means in affluent circumstances, what amounted to eight or nine years of board, lodging and personal care, but also received directly from Mrs. Winfield important and valuable assistance as a bookkeeper for a period of fourteen years—services which he had to render as a part of his employment, for which he was paid and which he was incapable of rendering personally in a satisfactory manner. The evidence also establishes, to my satisfaction, that Mrs. Winfield was never paid by Captain Cosgrove, directly or indirectly, for any part of these services.

No books of account, such as the testimony shows Captain Cosgrove was obliged to keep, and in fact did keep, were produced in evidence. Young Mr. Winfield testifies that in 1893, five or six years after Captain Cosgrove had given up active employment and consequently ceased keeping books, when he

was about to remove from the home of the Winfields and establish himself in Elizabethport again, he burned these books in the back yard of the Winfield premises, together with other things which were of no longer any value and with which naturally he would not wish to be encumbered.

The first question which presents itself for solution is whether all this labor was performed by Mrs. Winfield, and board and lodging for these many years were supplied by her or her husband as a mere gratuity to Captain Cosgrove, this old family friend, this bachelor, without expectation of compensation, or, if with the expectation of compensation, merely with the expectation that such compensation would be voluntarily made by Captain Cosgrove in the form of a gift by will or otherwise. Captain Cosgrove apparently was not in the habit of making gifts, and supplied little or nothing of value in that form to the Winfield family. If the services were gratuitously rendered, they must have been, it seems to me, either purely out of good will or under the inspiration of the hope of a substantial legacy in Captain Cosgrove's will. Practically, the question in the case is whether the services were rendered under circumstances which gave the complainant a legal right to compensation, or whether the complainant was beguiled into rendering them in reliance on a legacy which might or might not be made.

In my opinion, the evidence in this case leads to the conclusion that what Captain Cosgrove received from Mrs. Winfield was furnished under circumstances which entitled her in law to compensation, and not under circumstances which merely left her to the enjoyment of expectations from the testamentary action of Captain Cosgrove, in respect of which, it turned out, she was bitterly disappointed.

The direct testimony in regard to the basis upon which the business relations of these people were established, in 1872 or 1873, comes from the husband of Mrs. Winfield alone. Counsel for the defendant, pursuing his legal rights, sharply excluded the testimony of Mrs. Winfield wherever it dealt with any "statement by or transaction with" the deceased Captain Cosgrove. Some testimony of this character inadvertently appears

in the case, but not, as I recall it, through any waiver or consent of counsel for the defendant.    Any such testimony must, of course, be excluded from consideration.

Mr. Winfield is a conspicuous example of what lawyers technically call a "bad witness."   In any matter requiring accuracy of observation, accurate regard to the questions of counsel or accuracy of statement in response thereto, his testimony would be of little probative value.   He is easily flustered, talks heedlessly, often answers one question when he thinks he is answering another, and the result is that his testimony is full of inconsistencies and even contradictions.    But it is noticeable that these characteristics of his testimony are exhibited equally in all parts of his story—those which are important to his wife's case, in which he is deeply interested, and those which plainly have little bearing upon that case.    It is easy to reach the conclusion that it would be unsafe to rely upon Mr. Winfield's accuracy in regard to matters in which the truth depended upon correct details without imputing to him the intention, even in a cause so deeply affecting his own interests, of manufacturing a story out of whole cloth and boldly supporting it by perjury.

Mr. Winfield, in his direct examination, testifies, in substance, that in 1872 or 1873, while he and his wife were living in Jersey City, about a year after their marriage, Captain Cosgrove came to their residence and proposed to Mrs. Winfield, whom he called "Minnie," that she should take charge of his books, and perhaps some other business, and that he stated that he did not expect her to work without compensation, and when asked by Mrs. Winfield what her compensation would be, he said that he would get her a house and lot wherever she saw fit to select a place of residence, *when he was able*.    Taking the whole testimony of the witness on direct and upon cross-examination, I think that he means to testify that the proposition included the board and lodging of Captain Cosgrove, which at that time would not amount to more than about a day in the week, or a day and two nights on the average, and that while the parties contemplated that the house and lot, when procured, should at once become the residence of Mrs. Winfield,

the conveyance of it would be effected by Captain Cosgrove's will.

It may be conceded that the contract, as originally made, lacked several of the characteristics necessary in a contract which can be specifically enforced by this court. If, in pursuance of this arrangement, Mrs. Winfield had rendered services as bookkeeper and furnished board to Captain Cosgrove for a number of years, and then he had died or undertaken to disaffirm the contract, Mrs. Winfield's sole remedy might have been by an action at law on a *quantum meruit*. If the parties had never done anything to make the contract definite in its terms, it may be conceded that no court of equity would enforce it specifically and no action at law could be maintained upon it.

But the situation was radically changed as time went by. In 1881 Captain Cosgrove and the Winfields proceeded to select a lot in the city of Newark—101 Congress street—which Captain Cosgrove bought in his own name, and upon which he erected a dwelling-house to meet the requirements of the Winfield family. From 1881 until about 1888 all the parties appear to have continued their relations in precisely the same way as while the Winfields were living in Jersey City. Mrs. Winfield kept the books and made the reports and Captain Cosgrove had his room ever ready for him and occupied the same and took his meals with the Winfields, usually from Saturday until Monday of every week.

In 1885 Captain Cosgrove made his will. This will was drawn by Mr. Charles A. Feick, a practicing lawyer of Newark. Some time between 1896 or 1898 and Captain Cosgrove's death, in 1899, the will appears to have been destroyed by Captain Cosgrove himself. At any rate the will has not been found, although due search has been made therefor. Mr. Feick testified to its contents. He recollects distinctly that the will left the Congress street house to Mrs. Winfield, and he thinks that there was some conversation at the time of the execution of the will in regard to the reason for this devise, and that Captain Cosgrove gave as a reason that he had boarded with the Winfields a long time and had not paid any board, and that he was

making the devise "for compensation of that kind." The witness cannot swear positively in regard to this matter, but he seems to have confidence in the general accuracy of his recollection. It is evident that Captain Cosgrove might have included in his statement a reference to the services of Mrs. Winfield, and yet Mr. Feick, not being aware of the special services which Mrs. Winfield was rendering and had rendered, would not appreciate the full force of the words which the captain employed. The indebtedness for board he would readily understand and be apt to remember. If the phrase was "board and services," Mr. Feick would be very apt to refer the word "services" to such services as are usually rendered by the boarding-house keeper. If Captain Cosgrove's statement left it uncertain whether he was seeking to discharge a legal obligation or a moral obligation only, the fact remains that he admitted that he had boarded with the Winfields for a long time and paid no board, and he declared, not that he was making a gift, but that he was rendering compensation. There was no reason why he should disclose to the lawyer any bargain which he had made with the Winfields years before, and there are indications in this case that Captain Cosgrove, possibly from a motive of pride, was inclined to conceal the fact that he was unable to properly discharge an important part of the duties of his position, and therefore was obliged to call in the aid of a woman.

The testimony of Mr. and Mrs. Winfield, and their son, I think as well, is positive in regard to the contents of this will. They say that it not only devised the house and lot, No. 101 Congress street, but also gave Mrs. Winfield a legacy of $2,000.

A writing without date is also produced, which is proved to be in the handwriting of Captain Cosgrove. The possibility of forgery is practically excluded and no attempt was made to question the genuineness of the writing. It is a rude attempt at a will or instructions for a will, such as an illiterate man would be liable to write down. It undertakes to give to Mrs. Winfield the house and lot known as 101 Congress street, Newark, N. J., and $2,000. Five hundred dollars is given to a sister, Bridget Bowen, in trust for another sister and the residue of the property

is then given to the sister Bridget Bowen. There is no sig-
nature. At the top of the paper, as an after thought, or to cor-
rect an omission, are the words "My gold wach and Chaine to
Frank S winfield."

I shall not undertake to discuss the conflicting testimony in
regard to the history of this paper. The testimony of Mr.
Winfield in regard to it strikingly illustrates the difficulty which
this gentleman experiences when he undertakes to confine his
mind to any subject-matter, to listen to questions in regard to
such subject-matter, and answer them thoughtfully and in-
telligently.

I cannot find from the testimony support for the theory that
Mrs. Winfield, often at the expense of the performance of her
household duties, rendered these important and valuable services
to Captain Cosgrove for ten or twelve years in order merely to
curry favor with the old bachelor and win from him a reward in
the shape of a legacy. I do not think that the perusal of this
whole testimony would justify the conclusion that Captain Cos-
grove would have gone to Mrs. Winfield, this young married
woman, the daughter of his old friend, who, however, was under
no obligations to him, and would have asked her, year after year,
to render these efficient and valuable services, to receive him
into her house from week to week and keep a room there always
ready for him without offering her any pecuniary compensation.
To ask for and receive such services gratuitously would be dis-
creditable to a man in Captain Cosgrove's position. While it
may be that the testimony of Mr. Winfield, discredited by his
great interest and by the qualities of mind which affect his
accuracy as a witness, to which I have referred, might be a totally
insufficient basis upon which to establish the first proposition
of the complainant's case, viz., that the services were rendered
not gratuitously and not in reliance merely upon the good will
of Captain Cosgrove to be manifested in a testamentary gift, I
still think that this testimony is strongly corroborated by all
the probabilities in the case and by the conduct of the parties
abundantly proved by impartial witnesses.

When the lot in Congress street was selected by Mrs. Win-

field and Captain Cosgrove, in 1881, and the house was built upon it, and the Winfields moved into it and maintained, as before, a room and home for Captain Cosgrove whenever he desired to come, then, for the first time, the compensation which Mrs. Winfield was to receive was definitely fixed between the parties and Mrs. Winfield went on performing the contract on her part in reliance upon the promise of Captain Cosgrove to leave this house and lot to her by his last will. This promise was repeated frequently, according to the testimony of some of the witnesses, and Mrs. Winfield herself was allowed to retain the possession of the will from a time shortly after its execution until 1896 or 1898, a period of twelve or thirteen years.

In 1887 or 1888—I think it was in the fall of 1887—Captain Cosgrove was obliged to abandon his position as captain of the tugboat on account of his infirmities, and he does not appear to have been actively engaged in business at any time thereafter until his death in January, 1899. He took up his permanent residence with the Winfields in the Congress street house. He then proposed, according to Mr. Winfield's testimony, that inasmuch as the Congress street house was too large and the character of the neighborhood had changed, it would be well for Mrs. Winfield to select a location elsewhere in the city of Newark upon which he (Captain Cosgrove) would build another house. This plan was carried out. Mrs. Winfield selected a plot in Milford avenue. Mr. Winfield negotiated a sale of the Congress street house and lot for $4,775. The family moved into a house in Baldwin street, which Mr. Winfield rented, where they remained about six months, while the new house in Milford avenue was building. Mr. Winfield testifies to conversations between himself, his wife and Captain Cosgrove, in which Captain Cosgrove stated most positively that the Milford avenue house should be substituted in his will for the Congress street house. The lot in Milford avenue was conveyed to Captain Cosgrove, precisely as the Congress street lot had been conveyed, and in like manner Captain Cosgrove contracted for the erection of the dwelling-house upon it and paid the cost thereof. The house and lot appear to have been less valuable than the Congress street property, the total cost being $3,600, or at most $4,000.

The proofs establish, beyond all doubt, that, while the Milford avenue house was building and subsequently, Captain Cosgrove stated most positively to a number of disinterested witnesses, who were not in any way impeached, that the house belonged to Mrs. Winfield, or to Minnie, as he called her; that he had built it, or provided the money for its erection, but that it belonged to her. These statements appear to have led some persons to believe that the title to the property was actually vested in Mrs. Winfield, and they seem to me more natural and apt as the expression of the idea in Captain Cosgrove's mind that Mrs. Winfield had a right to the property which his money had paid for rather than of the idea that he intended, upon his death or at some time, to make a gift of the property to her as a recognition of kindness which he had received from her.

Mr. Hobby, one of the carpenters who built the Milford avenue house, whose impartiality and entire credibility are not questioned, testified positively that Captain Cosgrove told him that he was to do whatever Mrs. Winfield wanted to have done. He said, "I am building the house for her."

Mr. Searing, a bookkeeper, an intelligent and impartial witness, testified that at a little entertainment at the Milford avenue house, after the family had moved in, the subject of the house and its dimensions, &c., was under discussion, and that Captain Cosgrove said: "This house belongs to Minnie, but my money built it, or paid for it." The witness received the impression that Mrs. Winfield was then the owner of the house.

Mrs. May Sweeney, a friend of the Winfield family, but not related or apparently under any obligations to them, testified that before her marriage, when she was a young girl, she was visiting the Winfield family at their home in Milford avenue, when Captain Cosgrove also was a visitor. This was after Captain Cosgrove had left the Winfields and established his permanent home in Elizabethport. The incident took place some time in the year 1894, or possibly 1895. The witness at the time was about fifteen years old and admits that she was inquisitive in regard to the ownership of the Milford avenue

house, having heard that the property belonged to Mrs. Winfield. Accordingly, she put the question directly to Captain Cosgrove whether the house was his. He said: "No, it was Mrs. Winfield's house." The witness, with youthful inquisitiveness and impertinence, repeated her question until Captain Cosgrove showed some temper and got up and walked away.

The conduct of Captain Cosgrove is all consistent with the claim of the complainant, to the effect that she began rendering services to Cosgrove in reliance upon his promise to compensate her, although the promise may have been too indefinite for enforcement in any court—that when a house and lot had been largely, if not entirely, earned by many years of service, the same was provided for Mrs. Winfield's use; that soon after Captain Cosgrove made his will, not only devising this house and lot to Mrs. Winfield, but also making her a substantial gift in money; that later the Milford avenue house was substituted for the former one and that both parties to the original bargain agreed that this Milford avenue house and lot should go, upon Captain Cosgrove's death, to Mrs. Winfield, as the full measure of the compensation which then she had earned. Just as in the will of 1885, Captain Cosgrove had made a pecuniary legacy, recognizing the inadequacy of the devise to compensate Mrs. Winfield, so it may very well be that the Winfields relied upon similar testamentary action by Captain Cosgrove on their behalf after his obligation to them had been largely increased.

The board which probably was included in the original contract, plainly was such board as Captain Cosgrove would naturally wish to receive for about one day in the week upon the necessary occasion of his visits at the Winfield house in order to attend to his bookkeeping business with Mrs. Winfield. After 1887 it may be that Mr. Winfield gave Captain Cosgrove five years of continuous board and lodging in his family from motives of friendship or from expectations of a legacy, or from a desire not to imperil the performance by Captain Cosgrove of his obligation to leave, first, the Congress street house, and then the Milford avenue house, to Mrs. Winfield by will. So far as Captain Cosgrove's continuous board and lodging for the last

five years of his stay with the Winfields was not within the terms of the bargain to devise the house and lot to Mrs. Winfield, Mr. Winfield appears to be without remedy. Apparently all, or very nearly all, his claim, if there was a claim, was barred by the statute of lmitations at the time of Captain Cosgrove's death.

One circumstance proved in the case would tend to discredit the claim of Mrs. Winfield, if we were dealing with people who had not upon any theory of the case behaved in a manner contrary to those rules of foresight and prudence which ought to guide men, and even women, in all important business transactions. Such rules, however, are frequently disregarded when old friendship and confidential relations built thereon exist between the parties concerned. It appears that Mr. Winfield, who was the man of the house and the breadwinner of the family, to whom, as I have said, any legal liability of Captain Cosgrove would exist on account of the item of board, paid to Captain Cosgrove a sum of money during the whole period of the occupancy of the Congress street house and the Milford avenue house, down to the death of Captain Cosgrove, which amounted to about $250 a year. This money, Mr. Winfield says, was not paid as rent, but was a sort of contribution fixed upon between the Winfields and Captain Cosgrove as an equivalent of the "running expenses" of the property. As a matter of fact, this sum about equals the taxes on the Milford avenue house and the insurance and five per cent. upon the cost. The expense of repairs and other charges were borne by the Winfields.

When, with the full consent of Mr. and Mrs. Winfield, the Milford avenue property was substituted for the Congress street lot, in 1888, I think the proofs show that all parties accepted the Milford avenue property as the house and lot which Captain Cosgrove agreed to give Mrs. Winfield by a devise in his will at the beginning of the business relations between them. When the compensation under the bargain was made definite, in 1881, by the purchase of the Congress street property, and especially when Captain Cosgrove made his will, in 1885, with the full

knowledge of Mrs. Winfield, devising that property to her, and then allowed her to take possession of the will, the whole bargain, as I have heretofore stated, which was theretofore indefinite, became fixed and certain, and in reliance upon it Mrs. Winfield proceeded with the discharge of her duties under her contract.   For about seven years after the purchase of the Congress street property, and the apparent appropriation of it by Captain Cosgrove to the satisfaction of his agreement, Mrs. Winfield proceeded with the more or less laborious work of keeping Captain Cosgrove's books and making his reports.   For about two years after the will was made she continued this work.   When Captain Cosgrove quit his active business, about 1887, the greater part, but not all, of Mrs. Winfield's services as bookkeeper and business agent apparently terminated, but there is evidence that she still rendered services from time to time, in perhaps comparatively unimportant matters, down to the time, or almost to the time, of Captain Cosgrove's death. However this may be, while the bookkeeping may have ceased in 1887, from that time down to 1893, a period of five or six years, Captain Cosgrove, as we have seen, was boarded, lodged, fed and cared for as a member of Mr. Winfield's family.

I do not believe that Captain Cosgrove was guilty of the meanness of holding out to these people a glittering expectation of a substantial testamentary gift as the reward for their services and compensation for the home with which they gratuitously supplied him, while he craftily intended to defeat that expectation and receive, without rendering any compensation, all the benefits which these poor people were conferring upon him.   No such position was taken by counsel for the defendant in the argument.   If such a fraud had been perpetrated, I do not stop to inquire whether this court, or any court, could give the complainant any relief.   The whole history of the relations of these people strongly indicates that from the very beginning of their relations, in 1872 or 1873, down to the death of Captain Cosgrove, in 1899, the intention was, as Mr. Winfield distinctly testifies, that while the house and lot should be furnished to Mrs. Winfield when Captain Cosgrove became able to make

the necessary expenditure, the final conveyance of the house and lot was to be effected by Captain Cosgrove's will. The arrangement by which Mr. Winfield paid the fixed charges of the residence properties and about five per cent. upon Captain Cosgrove's outlay, accords with the theory that the compensation was to be by will.

In 1893 Captain Cosgrove removed from the Winfield house and went to live at the house of Mrs. Brown, a sister of Mrs. Winfield, at Elizabethport, where he boarded until his death, in January, 1899. It does not appear that this removal was caused by any estrangement between the Winfields and Captain Cosgrove. He repeatedly visited the Winfields' house and it appears that his room was always kept ready for him, and that no boarder was taken into the Winfield family on that account. A most affectionate letter is produced, written by Captain Cosgrove to young Winfield, dated July 5th, 1894. When Captain Cosgrove died, his trunk, where he kept his papers, was opened and examined, but no will was found. Mrs. Brown testified that he stated to her, presumably not very long before his death, that he had destroyed the will. He had, in 1896 or 1898, procured the will from Mrs. Winfield's house. The only testimony which we have on the subject indicates that he took the will at that time, with the knowledge and consent of Mrs. Winfield, together with some other papers of value which belonged to him, because they were then in the house of the Winfields, in Newark, where they were not entirely safe, while the Winfields were staying at Ocean Grove.

I do not think that it is a matter of much consequence what took place between the Winfields and Captain Cosgrove in regard to this will after 1893. If Mrs. Winfield is entitled to a decree in this case, she would have been entitled to it in 1893 if Captain Cosgrove had then died intestate, and before dying had destroyed his will with intent to defeat Mrs. Winfield's claim. There is no evidence to suggest that if Mrs. Winfield had a right, in 1893, to the Milford avenue property as the compensation for the services which she had rendered to Captain Cosgrove and the board in her family which Captain Cosgrove

had enjoyed, she ever lost that right by anything that occurred thereafter.

The whole conduct of Captain Cosgrove in dealing with both the Congress street house and the Milford avenue house discloses that it was his distinct purpose to hold the title to each of these properties during his life under his own control—that in each case the house and lot should remain his property until it should pass to Mrs. Winfield upon his death, by his will. It might be contended, although there is no evidence on the subject, that what the Winfield family paid out to all parties in connection with their occupancy of the Congress street house and the Milford avenue house amounted to a low rent for the same. If for this class of property a five per cent. net return to the landlord is somewhat below the market rate, it still is true that Captain Cosgrove was satisfied with the interest on his investment. The arrangement seems to have been that Mrs. Winfield was not to receive the compensation for her services until Captain Cosgrove's death. During the lifetime of Captain Cosgrove the one party continued, indefinitely, giving what was of substantial pecuniary value. The other party received these benefits through all these years for which he was bound to make compensation, but the compensation was fixed, first indefinitely as a house and lot situated somewhere, and then distinctly and definitely as a particular house and lot. I think that it is quite plain that, apart from the definite compensation agreed upon between the parties, there was an expectation on the part of Mrs. Winfield, and at one time an intention on the part of Captain Cosgrove, that he should recognize the insufficiency of the compensation agreed upon in the shape of a house and lot for services of so much greater value in an appropriate manner voluntarily, by giving Mrs. Winfield a substantial legacy. This is precisely what he did in 1885. He left Mrs. Winfield a house and lot, worth $4,775, and $2,000 in money, making $6,775 in all. This conduct of Captain Cosgrove accords with the testimony of young Mr. Winfield, to the effect that at a later period when his obligations to the Winfields had still further increased, Captain Cosgrove declared

that he regarded that what Mrs. Winfield had done for him was worth $8,000.

Whatever may have been the legal or equitable rights existing between Captain Cosgrove and Mrs. Winfield prior to 1888, in my judgment, when the Winfield family took possession of the Milford avenue property, there was then in existence a complete, definite, oral agreement between Mrs. Winfield and Captain Cosgrove, to the effect that, in order to compensate Mrs. Winfield for her services as bookkeeper during fourteen or fifteen years, which services had then been concluded, he (Captain Cosgrove) would give her the Milford avenue property by his will. I think, also, that the incidental board, to the extent of not more than one day in the week, which Captain Cosgrove had received from the Winfield family, was included within the compensation as agreed upon. Recognizing fully the safe rule which requires such a contract to be clearly proved, in my opinion, the proofs in this case come fully up to the required measure.

Mrs. Winfield relied upon this promise of Captain Cosgrove from 1888 until his death, eleven years later, and if during the last four or five years of his life she may have entertained a fear that he would not keep his word and perform his promise, which the evidence does not establish, the fact remains that long before any such notice could have come to her, while she had the captain's will in her possession, which gave her the Congress street property and undoubtedly a legacy of $2,000 as well, her claim for services on a *quantum meruit* had become barred by the statute of limitations.

The last question to be discussed is whether the legal remedy of Mrs. Winfield is adequate.

We have not here a case where the contract was to compensate Mrs. Winfield for her services by a legacy, or by a testamentary disposition of a nature undisclosed. In such case it may be that neither the statute of limitations nor the statute of frauds would bar an action brought now by Mrs. Winfield on the contract against the administratrix of Captain Cosgrove for the recovery of fair compensation for all services and all board

which may have been rendered or supplied in execution of the contract on her part. We have most distinctly a case of a promise to compensate Mrs. Winfield by a devise of land. Such a promise is within the statute of frauds. *Browne St. Fr. (5th ed.)* § *263; Johnson* v. *Hubbell, 2 Stock. 332; Gould* v. *Mansfield, 103 Mass. 408.*

There is not the slightest evidence in this case that Captain Cosgrove ever made any promise to compensate Mrs. Winfield for her services or to compensate Mr. Winfield for five years of board and lodging by a legacy or by any testamentary disposition except this devise—first, of the Congress street property, and then of the Milford avenue property. Any action at law, therefore, which Mrs. Winfield could now maintain would be confined to an action on the common counts to recover the value of her services, and could not be brought upon any contract of Captain Cosgrove to render her compensation by his will. Such an action, as we have seen, would be met by the statute of limitations as a complete bar.

Any action which Mr. Winfield might bring to recover compensation for the five years of board preceding 1893 would, in like manner, meet the bar of the statute of limitations.

Let us suppose it to be possible that Mrs. Winfield might maintain an action at law against Captain Cosgrove's administratrix and then in aid of such suit exhibit to this court a state of facts warranting an injunction prohibiting the defendant from setting up the statute of limitations as a defence. No such possibility has been suggested in the argument; no testimony has been taken with such a possibility in view. The complainant, it seems to me, cannot be deemed to have an adequate remedy at law when she can only pursue such remedy effectively in case she first succeeds in a doubtful preliminary suit in equity for an injunction, which no doubt would be hotly contested.

In view of the years of faithful service which Mrs. Winfield rendered to Captain Cosgrove—bringing to the management of his business the education, intelligence and skill as a scrivener and bookkeeper which he did not possess, and without which he might not have been able to maintain his responsible and lucra-

tive position, and, in view of the promises and statements of Captain Cosgrove, upon which Mrs. Winfield relied for many years, and in reliance upon which she has lost her legal rights, or at least allowed their enforcement to become difficult and expensive—it seems to me that to turn her out of this court now would amount to the accomplishment of a fraud.

Nor do I think that if Mrs. Winfield were able to maintain an action at law for the recovery of compensation to be fixed by a jury for all the services as bookkeeper which she rendered to Captain Cosgrove, and if Mr. Winfield were able to maintain a similar action for the five years of board, the result would accord with justice. The relations of these people were peculiar. Any assessment of damages or fixing of compensation by a jury would to a large extent be guesswork. The parties made their own assessment and fixed the compensation which Mrs. Winfield was to receive. It seems to me that it is equitable and just, both to Mrs. Winfield and to the estate of Captain Cosgrove, that she (Mrs. Winfield) should receive the very thing which she and Captain Cosgrove agreed upon as the measure of her compensation after all her services practically had been rendered. Assuming that the Winfields did not agree to board and lodge Captain Cosgrove indefinitely after 1888, because of the devise which he was going to make to Mrs. Winfield in compensation for what she had already done, and further assuming that Mr. Winfield did not in any way receive compensation for the five years' board which he furnished to Captain Cosgrove from 1887 or 1888 to 1893, the true conclusion, I think, is that inasmuch as Mrs. Winfield during all that period had the will in her possession which gave her a legacy of $2,000, both Mr. and Mrs. Winfield were entirely willing to allow their generous benefactor to have his home with them. Captain Cosgrove seems to have broken down in health in 1887 and the Winfields testify that he had several illnesses. It is not surprising that under these circumstances the matter of the captain's board was never made the subject of a bargain, and that the Winfields should have been led to give their old friend a home with them

without charge and in reliance upon this friend's testamentary benevolence.

If Mr. Winfield finds himself in the position of having supported Captain Cosgrove for five years under circumstances which prevented him from recovering compensation from Captain Cosgrove at any time, or now finds himself with what was originally a just claim against Captain Cosgrove for compensation barred by the statute of limitations, that is a matter which does not in any way affect the claim of Mrs. Winfield preferred in this case.

The alternative prayer of the bill to the effect that in case specific performance of the contract to convey the Milford avenue house cannot be enforced, then the amount justly due to Mrs. Winfield may be ascertained by this court in this suit and decreed to be paid out of the Cosgrove estate, may be noticed for the purpose of pointing out that neither the bill nor the testimony in this cause affords any basis for any such relief. The bill does not charge that Captain Cosgrove obtained the valuable services of Mrs. Winfield by any fraudulent practice, or that at any time while those services were being rendered he did not fully intend to make ample compensation for those services in accordance with his agreement and Mrs. Winfield's expectations. The case, therefore, is radically different from *Eggers* v. *Anderson, 18 Dick. Ch. Rep. 264.* In the class of cases to which this belongs it is very properly said that specific performance is granted, because to deny it would accomplish a fraud. Fraud is not redressed, but prevented, by the decree of specific performance.

In my opinion the complainant has no adequate remedy, either in a court of law or a court of equity, unless she can in this cause obtain a decree specifically enforcing the promise which I am satisfied Captain Cosgrove made to her, to the effect that the Milford avenue property should belong to her, at his death, as the compensation for the years of valuable service which she rendered to him.

I shall advise a decree for the complainant as above indicated, but, under the circumstances, without costs.