Joseph C. Johnson, complainant,

*v.*

Martin J. Wehrle et al., defendants.

---

Mary F. Brice, complainant,

*v.*

Martin J. Wehrle, administrator, &c., et al., defendants.

[Decided September 17th, 1931.]

*Messrs. Howe & Davis,* for the complainant Joseph C. Johnson.

*Mr. William H. Hamilton Osborne,* for the complainant Mary F. Brice.

*Mr. Henry H. Dawson,* for the defendants.

Backes, V. C.

These are companion bills; one by Johnson, a nephew, the other by Mrs. Brice, a sister of Catharine Beaver, de-

ceased, intestate, to obtain possession of her estate under alleged oral contracts to leave to the nephew her entire estate and to the sister, her homestead outright and the income on $15,000 for life, in consideration that they serve her as long as she lived. The defendants are the administrator, the next of kin and the heirs-at-law of the intestate.

Neither complainant being a competent witness in his own behalf, they "cross-ruffed" their testimony in support of each other's case and called the mother of the nephew and sister of the other complainant, a defendant in both suits, to witness that both contracts were made and made at the same time, though the one was inimical to the order.

Mrs. Beaver died in March, 1930, at the age of seventy-two, leaving a personal estate of $25,000 and the homestead, valued at $16,000. Her husband died two years before in June. The nephew, years ago, had made his home with them until he was sixteen and their intimacy continued and he regarded himself as their heir prospective; they had told him so. The sister had been all her adult life at service and at sixty-five, temporarily unemployed, came to the Beavers a few months before Mr. Beaver died, to assist in the household. The idea of leaving her estate to them came to Mrs. Beaver, according to the three principal witnesses, on the Sunday following Mr. Beaver's funeral, while the four were on their way home from his grave after having stopped to see an old sick friend, Newman, whose forlorn condition provoked her to remark that, "I am going to take damn good care to fix things so it don't happen to me." They say that the sight of Newman preyed upon her so that she talked about it well into the night and the next day and that Tuesday, according to nephew Johnson who testified to his aunt's claim, Mrs. Beaver said to him:

" 'I am not going to be left alone and I do not want to be left alone, and I am going to make sure to have somebody with me. I want Mary to stay with me, but,' she says, 'Mary is used to having a day off, she is always feeling as though she wants to go—she likes to be free.' She says, 'if Mary

comes with me she has got to stay with me, take care of my affairs, housekeeping and be with me at all times, but,' she says, 'I spoke to Mary and Mary don't seem to like the idea, and,' she says, 'what can I do? What do you think I can do?' She says, 'I spoke about leaving her the house, but Mary don't seem to be satisfied with it.' She says, 'what do you think would be necessary to induce Mary to stay here?' She says, 'I want to be positive that Mary will stay.' I told her, 'now, if Mary won't stay here—she says the house don't amount to anything because the income won't take care of her, she will have to go out to work.' That is what Mrs. Beaver told me. I said, 'I suppose it would be the right thing if you suggest to her to give her a fund—that is, not to give her the money outright, but to give her a fund in trust on which she would get a regular income monthly.' She says, 'how much would it take to give her a monthly income?' Well, then it was a question of how much income she wanted to give her monthly, how much she thought was proper and reasonable, if it would equal her old salary or less in consideration of the house. She said about equal to her salary at her other places. That was fixed around $900 and fixed at $15,000. She says, 'I will put that proposition up to Mary.' * * * It was a matter of a couple of days (later), as near as I can fix the time. It was either Friday or Saturday of that week. * * * My mother happened to be present. Mrs. Beaver called Mrs. Brice, my mother and myself in the front room. 'Now,' she said, 'Mary, I want you to stay with me,' and she says, 'if you will stay with me, I am going to give you this house outright,' but she wasn't satisfied with that. 'Now, I am going to give you a trust fund that will give you an income of $900 a year, that will make it unnecessary for you to go to work or to earn anything to support the house, and,' she says, 'I want you to stay with me, do my work, do whatever I ask you to do, and when I die, you will get the house outright, you will get this trust fund. In the meantime I will give you five dollars a week for pocket money so that you won't have to come to

me and ask me for every little thing you need; I know you don't feel like doing that.' * * * Mary said, 'Kate, if you will do that, if you will do that, you will give me the house outright and you will give me that trust fund,' she says, 'I will do what you ask me to do; I will stay with you for life; I will do whatever you want me to do.'"

Mrs. Brice, testifying for Johnson, says that when her nephew came Tuesday Mrs. Beaver said to him:

"'I want to make an agreement with you that you stay and do anything that I ask you to do, to take care of my business and welfare and to be with me and take the place of my dear husband, that I'm afraid to be alone. * * * I want to be protected. I want a man in the house that I can trust to be with me.' And the nephew asked: 'Well, Aunty, how will I be protected in this regard?' Adding, 'I will do anything you tell me to do.' She replied: 'Why, I will make a will to that effect.'"

(Mrs. Brice failed to state what Johnson was to get.)

Mrs. Johnson, testifying for both complainants, says:

"Tuesday morning she asked Joe if he would take care of her business for her, look after her business, take the place of Uncle Will and do everything that she asked him to do, anything around the house, anything she asked him, that she would leave to him everything she owned. Then she said, 'now, I want Mary to stay with me, and,' she said, 'Joe, do you think Mary will stay with me if I give her the home?' Joe said, 'go and ask Mary.' She asked Mary. Mary said she wouldn't stay, what good was the house, she would have to go to work, she couldn't live off the house, by the time the taxes was paid and all there wouldn't be enough there to live off of, so then Mr. Johnson said to Mrs. Beaver, 'you would have to leave her somthing more than that,' so they figured out what it would be. By the time they had figured out the taxes, figured out the gas and different things that had to be taken care of in the house I think there was something about a hundred dollars would be left, hundred dollars from the flat upstairs would be left from the rent of the flat. Mr.

Johnson figured up that it would take $15,000 to give her $900 a year. I think that would be around about what Mrs. Brice had been in the habit of getting, about twenty dollars a week or something like that, I think. * * * Then Mrs. Beaver went back to Mrs. Brice and told her that she would give that—she wouldn't give her the money, only the income off of the $15,000. Then Mrs. Beaver went back and asked Mary and Mary dillied around, she didn't want to be tied down."

"The Court—Were you there at all these——(interrupted).

"Witness—I was there that day, absolutely. But Mrs. Beaver wanted before that——(interrupted).

"The Court—I am wondering whether you were there when she went to Mrs. Brice?

"Witness—No.

"The Court—Did you hear what she told Mrs. Brice?

"Witness—We were in the next room, right in the next room.

"The Court—You said she went to her?

"Witness—She called her in. She called her in. Because Mr. Johnson told Mrs. Brice—Mrs. Beaver if Mrs. Brice was to stay there she would have to provide for Mrs. Brice as she promised when she went there that she would provide.

"The Court—Now, please let us get what was said that day?

"Witness—She told Mrs. Brice she would give her the house outright and she would give her the income off of $15,000 and she said, 'Mary, now understand, I do not mean $15,000, I mean just the interest off of it.'

"The Court—Now, I want to understand whether you were present when Mrs. Brice said the house itself would not be enough?

"Witness—I was not in the room when she said the house itself would not be enough in the first place; she was out in the kitchen.

"The Court—You are telling me something then that somebody told you or you are guessing at.

"Witness—No; Mrs. Beaver went out——(interrupted).

"The Court—Did you hear her ask her?

"Witness—Why, yes, we were in the next room. She went out——(interrupted).

"The Court—Did you hear Mrs. Brice object?

"Witness—Mrs. Brice?

"The Court—Did you hear her object?

"Witness—Yes, sir; she said she wouldn't take the house alone because she couldn't get along. Mrs. Brice was a very loud talker—very loud.

"The Court—Was anything said——(interrupted).

"Witness—Then Mrs. Brice said on that—she said—Mrs. Beaver said, 'If you will give me the house——.'

"The Court—What?

"Witness—Mrs. Brice said, 'If you will give me the house——.'

"The Court—Who said it?

"Witness—Mrs. Brice said to Mrs. Beaver when she offered it to her after—after the amount was figured up, and she says, 'if you will give me enough to live off,' which Mrs. Beaver agreed to give her, the income, the $900, she says, 'I will stay with you until your death, look after you and do everything.' She says, 'Kate; everything that you want me to do;' and she even went further, she asked her how she would be protected in that. She says, 'you know what kind of a family we got and I want to be protected so I can go out and make my money,' she says, 'and I know what I got and this way I don't know if anything should happen to you.' And Mrs. Beaver said she would make her will, see, to protect Mrs. Brice."

Mrs. Johnson says Mrs. Beaver "rehashed" her promises on frequent occasions, once particularly, as she relates, a year later—

"Exactly the same thing right over again, and she said she would leave a will giving Joe and entire estate, but she says, 'Joe, you will have to look after Aunt Mary to see, understand, if she dies, take care of all her affairs and see

that Aunt Mary got the home and the income as long as she lives.' "

Objection is made to the testimony of Mrs. Johnson as not competent under section 4 of the Evidence act. She is a co-defendant. Her interest in the subject-matter of the litigation is subordinate, not adverse to the rights of the administrator. The complainants had the right to call her, as they had the right to call the administrator or any of the other defendants whose interest is opposed to them to testify to conversations or transactions with the deceased. A party to a suit against an administrator whose interest in the matter in litigation is not adverse to the estate represented by the administrator is not disqualified as a witness under section 4 of the Evidence act. *McCartin* v. *Traphagen's Adm'r, 43 N. J. Eq. 323*. Mrs. Johnson was a qualified, though manifestly a biased witness in giving testimony against her own interest.

At the hearing, the testimony of the principal witnesses did not ring true, and, after reading the transcript, the then impression stands unmodified, that a contract with either complainant is not made out clearly, definitely and convincingly as the law demands in circumstances where temptation to perjury and the opportunity of fraud is so inviting and with little danger of detection. *Vreeland* v. *Vreeland, 53 N. J. Eq. 387; McTague* v. *Finnegan, 54 N. J. Eq. 454.* The stricture is in the abstract, but it is nevertheless felt that the parties knew the essentials of such contracts and that they persuaded themselves they existed. The Johnsons seem of a higher order of intelligence than Mrs. Brice. The nephew Johnson testified with great precision, presuming to repeat verbatim the oral contract with his aunt with an exactness that indicated careful preparation and perfection of manner to give force to his testimony; a lead his mother was unable to follow. She was far less orderly in her recital of events; confusing at times and at others in strange conflict with her son, viz.: According to his story, Mrs. Beaver told him Tuesday that Mrs. Brice had rejected the offer of

the house and that he then suggested an annuity and figured it out and that she said she would "put the proposition to Mary," and that Friday or Saturday following Mrs. Beaver called Mary to the front room where explicitly it was submitted and accepted. The mother says that Tuesday morning, after making the contract with her son, Mrs. Beaver asked him if he thought Mary would stay if she gave her the house and was told by him to "go and ask Mary," and that in the kitchen, where she had gone, Mary refused; that after the annuity fund was figured out Mrs. Beaver returned to the kitchen and made the offer, but Mary "dillied" around, and that she called her in to the front room where the offer was formally made and agreed to by Mary. Now, if on Tuesday Mrs. Beaver already knew Mary had rejected the house, as the son says she told him, she was not in doubt about it and it is hardly likely that she went into the kitchen to make inquiry of Mary; and if on Tuesday the son calculated the annuity and Mrs. Beaver said she would put the annuity proposition up to Mary and it was not put up to her until Friday or Saturday, as the son says, what becomes of the mother's "put and take" story of Tuesday? It is also somewhat difficult to understand that, with Mary in the house with her, in constant and intimate intercourse, Mrs. Beaver should wait until Friday or Saturday, until the nephew and his mother were again present, as the son maintains, before putting before Mary, and then in measured terms, the offer of the home and the annuity. If there was all this ceremony and formality in binding the contracting parties, one is prompted to ask why were the negotiations not reduced to writing? And if Mrs. Beaver made the promises and regarded herself in conscience bound, and she was an honest woman, nobody denies, it is odd that she did not heed the advice of her lawyer, Mr. Dawson, repeatedly made, to make a will. However, the discrepancies, if they do not indicate fabrication of the contracts out of a skeleton of circumstances, do at least contribute obscurity, indefiniteness and uncertainty. And when we add to the confusion,

the conflict between the two alleged contracts and the nephew's lame explanation to reconcile them, that he waived *pro tanto* his supposedly perfectly valid and enforcible contract to inherit the entire estate, so as to let in his aunt's contract; the mother's interpretation of the contracts, that her son's contract was to be testamentarily executed upon condition that he assure his aunt of the house and the annuity; the fact that the nephew, ignoring his contract, preferred a claim against the administrator under oath for $10,000 for personal services rendered the deceased "for which she promised to pay the reasonable value thereof," and the further fact that at a meeting of the next of kin to select from among them an administrator, neither of the complainants asserted his contracts, but instead, the nephew claimed that Mr. Beaver promised him his tool kit and Mrs. Brice claimed that Mrs. Beaver promised her her jewelry, all in proof, they leave the mind unconvinced and specific performance inadmissible.

This fact is also disturbing. Mrs. Brice alleges in her bill that the contract with Mrs. Beaver had its origin in an understanding with Mr. and Mrs. Beaver, that if she remained she should have the property at Mrs. Beaver's death. She must have told that story to her counsel. Now, and in conflict, it is the testimony of the three principal witnesses that the contracts sought to be enforced were the spontaneous idea of Mrs. Beaver after she witnessed Mr. Newman's distressed condition the Sunday following her husband's funeral, to avoid a like experience.

Little account can be made of statements made by the deceased to strangers, of her intended disposition of her property, to support either contract. To some she said her nephew was to get all and to others that her sister was to have the homestead. They are as unreconcilable as are the alleged underlying circumstances from which it is sought to spell out contracts.

But assuming that there were contracts, they are not in writing, and performance claimed by the complainants is

not marked by characteristics that will influence equity to override the statute of frauds. There is an adequate remedy at law.

Johnson, the nephew, was to do errands, chores and the like, anything he was asked to do. He testified only of things he did for Mr. Beaver. His mother, in her enumeration of his services to Mrs. Beaver, adverted mostly to those rendered Mr. Beaver—gathering data and land values in anticipation of condemnation of some of his land and keeping a watchful eye on municipal proceedings to take the homestead in condemnation. Mrs. Beaver was capable of handling the business and she had Mr. Dawson as her legal advisor. A feeble effort was made to take the case out of the statute by a showing that his attention to his aunt's affairs altered his course of life and resulted in neglecting an oil burner business, to his loss. He is still in the business and as a sideline, is a detective, he says. The nature and extent of the oil burner business, a place, an agency or door to door salesmanship, is not disclosed, nor does it appear that degredation in occupation was caused by his devotion to his aunt and her affairs.

Mrs. Brice was a house servant from early girlhood, an exceptionally good cook, it is said, and, although aged and deaf, had employment. She had left her last job a week before going to the Beavers to help out. The alleged unusual service undertaken and rendered by her (calculated to take the case out of the statute of frauds) of inestimable value to the deceased and of unascertainable loss to her, that changed her whole course of life, was, that she engaged to be in constant attendance, never to leave the deceased alone, and resulted in the loss of her freedom—her Thursday afternoons out and her evenings off, after work done. Her routine work with Mrs. Beaver after Mr. Beaver's death, in the small downstairs apartment of the homestead, only the two of them, and sisters, it is fair to assume was less laborious than in the households she from time to time served, and although it does not appear that she had regular days off or her evenings out,

it is not apparent that she was not at liberty to go at will, as she chose, and that she had not all the freedom and perhaps more than she enjoyed when working for strangers, for it is in evidence that she was taken out riding and was frequently seen on the streets. It is fair inference that restrictions of freedom, if any, found compensation in many privileges that are left untold.

It is felt that this hard-working work-out old woman found surcease, comfort and contentment in the home of her sister, where she was willing to be of service in the expectation of being rewarded by her rich sister, who, mayhap, held out the prospect. At all events, she did not step out of her ordinary vocation and if her work there was more arduous than in her other jobs, it is estimable by a jury. She will be left to her remedy at law. The case is ruled by *Cooper* v. *Colson, 66 N. J. Eq. 328.* The bills will be dismissed.